SLIDELL & Another *v.* GRANDJEAN, Deputy Surveyor of the United States.

SAME *v.* RICHARDSON, Register of State Land Office of Louisiana.

SAME *v.* EMLER & Others.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

SAME *v.* TSCHIRN.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

*Public Land—Houmas Grant—Spanish Custom—Construction of Statutes.*

In an order by a Spanish governor of Louisiana recognizing an Indian grant and directing the issue of "a complete title," these words, as translated, refer to the instruments which constitute the evidence of title, and not to the estate or interest conveyed.

It was a usage of the Spanish government, in granting lands on the river, to reserve lands in the rear of the grants to the depth of forty arpents, the

grantee of the river front having the preference right to purchase the reservation.

Usages and customs respecting the alienation of lands prevailing in Louisiana previous to its acquisition by the United States have, to a great extent, the efficacy of law, and are to be respected in considering the rights of grantees of the former government.

When established, such usages and customs control the construction and qualify and limit the force of positive enactments.

The original Houmas grant in Louisiana from the Indians, on the 5th of October, 1774, had a defined length on the river Mississippi, and designated coterminous proprietors to the north and to the south, but no depth to the grant was named. The Spanish governor executed a formal grant of the tract, describing it as of the common depth of forty arpents. Two years later, on the petition of the grantee, the governor directed his adjutant to give the petitioner the land which might be vacant after forty arpents in depth. This was done by a survey running the northern and southern boundaries on courses from the Mississippi for forty arpents and for two arpents additional; *Held,* That, in view of the Spanish usages, and of the action of the Spanish authorities, and of the action of Congress and of United States officials, all of which are referred to, the concession extended in the designated courses to the depth of eighty arpents from the river.

In case of doubt, a legislative grant should always be construed most strongly against the grantee.

When a statute authorizes the creation of a commission of three to decide upon land grants, a majority of whom "shall have power to decide," "which decisions shall be laid before Congress," "and be subject to their determination," their decisions have no binding force until acted upon by Congress.

An act confirming "the decisions in favor of land claimants made by" A, B, and C, reciting their names, does not confirm a decision made by A and B and dissented from by C, although the act under which the commission was created provided that a majority of the commissioners should have power to decide.

A legislative confirmation of a grant of land of which no quantity is given, no boundary stated, and no rule for its ascertainment furnished, is void for uncertainty. The distinction between such a confirmation and that passed upon in *Langdeau* v. *Hanes,* 21 Wall. 521, pointed out.

These suits, which involved the validity of the titles to land in Louisiana under what is known as the Houmas grant, were heard together. The court below held that that grant was limited to a depth of 40 arpents from the river. The claimants under the grant appealed from this decision in three of the cases and brought their writ of error to reverse the fourth. The voluminous facts, action of Spanish authorities, action of Congress, action of United States authorities, decisions of commissions,

and decisions of courts, which go to make up the issues, or bear upon them, are fully set forth in the opinion of the court.

*Mr. James L. Bradford* for appellants and for plaintiffs in error.

*Mr. Solicitor-General* for Grandjean and as *amicus curiæ.*

*Mr. William Grant* (*Mr. J. D. Rouse* was with him) for appellee Richardson, and defendant Tschirn.

The case was argued on the 2d January, and a decision announced on the 3d March, 1884. On the 24th March, 1884,

Mr. Justice Field announced the following order:

On the argument of these cases the contention of the plaintiffs was that the grant of Governor Galvez to Maurice Conway, on the 21st of June, 1777, embraced all the land in the rear of the original grant to him and Latil by Governor Unzaga, in November, 1774, included within the boundary lines of that grant extended to the limits of the possessions of the Spanish Crown. In support of that contention, reliance was placed upon the report of the commissioners appointed under the act of Congress of 1805, the plats of the surveyor Lafon and the alleged confirmation by the act of June 2d, 1858. We held that the grant of Galvez derived no aid from these sources, but must depend for its extent upon the language of the concession and the proceedings of the adjutant Andry in establishing its northern and southern boundaries; and that it was therefore limited to two arpents in the rear of the original grant.

The plaintiffs ask a rehearing, contending that if they are not entitled to the land claimed under the report of the commissioners construed by reference to the plats of Lafon and the confirmatory act of June 2d, 1858, they are entitled by virtue of the concession and accompanying report of Andry construed in accordance with the usages of the country, having the force of law, to forty arpents, the quantity alleged to be the amount intended in the absence of specific designation to be ceded in

cases of grants in the rear of the land of proprietors on the river, thus giving to the two grants an extent of eighty arpents from the river. And the plaintiffs have presented so many considerations in support of this view, that the court will receive arguments from counsel upon this point, to be in writing and filed within two weeks from date. The clerk will give to the counsel of the plaintiffs and to the Attorney-General a copy of this memorandum.

*Mr. Willis Drummond* and *Mr. Robert H. Bradford* on this point filed a brief for appellants and plaintiffs in error.

*Mr. J. D. Rouse* and *Mr. William Grant* filed a brief for all the defendants.

*Mr. Solicitor-General* filed a brief for the United States.

These briefs were handed to the court on the 8th April, 1884.

MR. JUSTICE FIELD delivered the opinion of the court.

Of these suits the first three are in equity; the fourth is at law. They were argued together, as they are all founded upon the supposed validity of the plaintiffs' title to the Conway division of the Houmas grant in Louisiana beyond the depth of eighty arpents from the Mississippi River. If their title beyond that depth be sustained other questions will arise for consideration, but if that fails those questions will be unimportant. The Houmas grant is famous in the history of land titles in Louisiana, from the protracted controversy in the Land Department to which it gave rise, and the discussion created in Congress by the attempt made to secure its legislative confirmation. The documents to which our attention has been called as sustaining the pretensions of the plaintiffs, or in opposition to them, are scattered through many volumes. They consist of the original proceedings and concessions under the Spanish government; the orders of the territorial governor and certificates of a local surveyor after the cession of the country to the United States; the proceedings of the board of commissioners created by Congress to examine into and report upon land

claims in that Territory; various petitions to the officers of
the Land Department, and their reports thereon; the opinion
of the Secretary of the Treasury and of the Attorney-General
upon the nature and extent of the grant, and the proceedings
of Congress in passing an act of confirmation, and subsequently
repealing it. We shall endeavor to condense the history of
the grant, and of the various proceedings taken with reference
to it, into as narrow a compass as possible.

On the 5th of October, 1774, while Louisiana was under
the dominion of Spain, tribes of Indians, known as the
Houmas and Bayou Goula tribes, had possession of certain
land situated on the left bank of the Mississippi River, about
twenty-two leagues above New Orleans, and claimed some
interest in it, the extent and nature of which are not given.
Whatever that interest may have been, the Indians sold it on
that day to two persons by the name of Maurice Conway and
Alexander Latil for the consideration of $150. A conveyance
of that date executed at New Orleans before a notary public
by one Calazare, describing himself as chief of the tribes, ap-
pointed such by the governor of the province, recites that the
tract had once belonged to a Frenchman, that he had sold it
to another Frenchman, who had abandoned it, and that after-
wards, being vacant, the two Indian tribes fixed their residence
upon it by permission of the governor. The chief, on behalf
of the Indians, renouncing whatever rights they possessed,
ceded the land to the purchasers, and stipulated that after ob-
taining the permission of the governor they might possess it as
absolute owners; that a copy of the instrument should be pre-
sented to that officer for his approval, without which they
could not be permitted to take possession. It would thus
seem that the right of the tribes was one of mere occupancy
at his will, and that the title at the time was in the Spanish
crown. On the same day Unzaga, the governor of the prov-
ince, approved the instrument thus executed, and in pursuance
of the authority vested in him granted the land to the pur-
chasers, directing them, however, to apply to him in order that
full title papers—a complete title, as the language used is trans-
lated—might be issued to them. The words translated " a

complete title " refer, however, only to the instruments which constitute evidence of title, and not to the estate or interest thereby conveyed. *De Haro* v. *United States*, 5 Wall. 599.

The land granted is described in the conveyance of the Indians as a tract "measuring upwards of half a league, at the distance of twenty-two leagues from this city on this side of the river, joining on the upper side lands belonging to John the blacksmith, and on the lower side the place where are erected the huts in which the said two nations of Indians now live; but when the said huts will be taken away, to be transported on the other side of the river, the true boundary on the lower side will be the lands belonging to an old Acadian named Peter; so by the measurement which the said purchasers will make of the said tract of land, according to the said boundaries, its exact contents will be ascertained."

It will be perceived from this description of the land that no depth is given. On the first of November following, the governor executed to the purchasers a formal grant, describing the tract as having "the common depth of forty arpents." The tract was thus rendered susceptible of identification and measurement. Its front bordered on the river; its side lines were determinable by adjoining tracts, and it was of the depth mentioned. When grants fronting on the river were made by the Spanish government, it was customary to reserve, to the depth of forty additional arpents, the lands immediately in the rear, to be used by the front proprietors for pasturage, or to obtain timber for fences or for fuel. The law on this subject, which prevailed in the province, is very clearly and distinctly stated by Mr. Justice Catron in delivering the opinion of this court in *Surgett* v. *Lapice*, 8 How. 48, 66. He says that "the grants were not large, and fronted on the river only to the extent of from two to eight arpents as a general rule, and almost uniformly extended forty arpents back; to these front grants the Spanish government reserved the back lands to another depth of forty arpents; and although few, if any, grants were made of back lands in favor of front proprietors, still they were never granted by the Spanish government to any other proprietor, but used for the purpose of obtaining fuel and for

pasturage by the front owners, so that, for all practical purposes, they were the beneficial proprietors—subject to the policy of levees, and of guarded protection to front owners. We took possession of Lower Louisiana in 1804 [December, 1803]; in 1805 commissioners were appointed, according to an act of Congress, to report on the French and Spanish claims in that section of country, and by the act of April 21st, 1806, it was made a part of their duty 'to inquire into the nature and extent of the claims which may arise from a right, or supposed right, to a double or additional concession on the back of grants or concessions heretofore made,' previous to the transfer of government, 'and to make a special report thereon to the Secretary of the Treasury, which report shall be by him laid before Congress, at their next ensuing session. And the lands which may be embraced by such report shall not be otherwise disposed of, until a decision of Congress shall have been had thereon.'

" The commissioners were engaged nearly six years in the various and complicated duties imposed on them, and then reported, that, by the laws and usages of the Spanish government, no front proprietor by his own act could acquire a right to land further back than the ordinary depth of forty arpents, and although that government invariably refused to grant the second depth to any other than the front proprietor, yet nothing short of a grant or warrant of survey from the governor could confer a title or right to the land; wherefore they rejected claims for the second depth, as not having passed as private property to the front proprietor under the stipulations of the treaty by which Louisiana was acquired."

On the 9th of September, 1776, nearly two years after obtaining the grant, Conway presented a petition to the governor stating that he was about to settle on the lands which he and Latil had purchased of the Indians; that he had acquired Latil's interest; that the lands were destitute of fences and were cleared for upwards of a league in depth in "such a manner" that the cypress trees might be "about a league and a half from the river," and that as the grant extended only forty arpents, he could not have access to them to obtain timber for

his fences, and other uses of his plantation. He, therefore, prayed the governor to grant him *all the depth which might be vacant at the end of his forty arpents*, and that Louis Andry, the governor's adjutant, might be appointed to put him in possession of the front and depth " by fixing the needful boundaries," and furnishing him " with copies of the whole transaction " for his " use and guidance." Upon this petition, the governor directed Andry to go upon the land and give the petitioner possession of *that which might be vacant after the forty arpents in depth*, and to make a report of his proceedings —a *proces verbal* as it is termed—in order that full title papers —" a complete title " in the translation—might be issued to the claimant.

In October following this order was executed by Andry. He went upon the land and first measured its front upon the river and ascertained it to be ninety-six arpents. Owing to its situation on a bend of the Mississippi, the tract widened as it receded from the river. He then ran the upper line north fifty degrees west to the depth of forty arpents from the river, " opening for that purpose a road through the woods," and placed there a stake of cypress. He then extended the line two arpents more, and placed another similar stake. He then proceeded to draw in the same way the southern line of the grant, running it north seventy degrees east, going for that purpose a part of the distance through woods, and placing a boundary stake of cypress at the depth of forty arpents, and also at the further depth of two arpents more, " in order," as he stated, " to keep the course." Of his proceedings on this survey Andry made a detailed report.

On the 21st day of June of the following year Galvez, the successor of Unzaga as governor of the province, made to Conway a grant of the land thus surveyed. In the instrument executed by him he recites that he had seen the report of the proceedings of the adjutant of the town relating to the possession given to Conway, pursuant to the order of his predecessor, " of all the vacant land lying behind and in the rear of the first forty arpents " which he then possessed " by ninety-six arpents in front on the river," and that the adjutant had followed the

directions (lines extended) of the original concession; and that these conformed to the rules of survey and to the concessions of adjoining proprietors.   He thereupon approved of the proceedings of the adjutant, and granted to Conway " the aforesaid land behind or at the end of the forty arpents which contain his plantation."

These are all the papers relating to the title to the Houmas grant executed by the authority of the governor of the province whilst it belonged to Spain.

As no back line is designated to the second grant its dimensions must be found, if at all, in the limitation to such grants imposed upon the authority of the governor by positive law or established usage.   As seen from the opinion of the court in *Surgett* v. *Lapice,* it was the invariable custom of the Spanish government to reserve lands in the rear of grants on the river, to a depth of forty arpents, for the use of the front proprietors.   They were always regarded as having a preference right to become the purchasers of those lands; they were never granted to other parties.   So well established was this rule in the usages of the province, that it was deemed by our government, after the acquisition of the country, to create in the front proprietor an equitable right to such preference.   Accordingly Congress, by the act of March 3d, 1811, provided that every person who owned " a tract of land bordering on any river, creek, bayou, or water course " in the Territory of Orleans, and not exceeding in depth forty arpents French measure, should be " entitled to a preference in becoming the purchaser of any vacant tract of land adjacent to and back of his own tract, not exceeding forty arpents French measure in depth, nor in quantity of land that which is contained in his own tract," at the price and on the terms and conditions prescribed for other lands in the Territory.   The usage of the country determined the depth of these grants of land in the rear of the premises of the front proprietors.   In *Jourdan* v. *Barrett*, this court, speaking of these concessions, said: " That back lands at all times meant those in the rear between the extended front lines in the rear, to the distance of forty arpents (each line being a straight one throughout), we

suppose to be undoubted, as a general rule, although there may have been exceptions to it." 4 How. 169, 182.

By reason of this usage it was only deemed essential, in surveying the second concession, to mark the courses of the upper and lower lines of the tract, the other boundaries being readily ascertained, one by the rear line of the original grant, and the other by a line drawn at a distance of eighty arpents from the river. This practice of surveyors is abundantly established by the documents accompanying the proceedings of Congress, or of its committees, with respect to the Houmas grant.

The usages and customs prevailing in the province of Louisiana, affecting the alienation of lands, are to be respected in considering the rights of grantees of the former government. Usages long established and followed have to a great extent the efficacy of law in all countries. They control the construction and qualify and limit the force of positive enactments. In Spain and in her dependencies great weight is given to such usages in the adjustment of rights of property. "Legitimate custom," says Escriche, "acquires the force of law not only when there is no law to the contrary, but also when its effect is to abrogate any former law which may be opposed to it, as well as to explain that which is doubtful. Hence it is said that there may be a custom without law, in opposition to law, and according to law." Escriche's Derecho Espanol, 23, 24; *Panaud* v. *Jones,* 1 Cal. 499.

In *United States* v. *Arredondo* this court, in considering a grant of land in Florida made by the King of Spain, said: " The court not only may, but are bound to notice and respect general customs and usage as the law of the land, equally with the written law, and, when clearly proved, they will control the general law." 6 Pet 691, 715.

Looking at the grant of Galvez and the survey of Andry in the light of the usage prevailing in the province, we have no difficulty in fixing its limits. It was for an additional forty arpents in the rear of the original concession, the lines of that concession being extended in the same course to the depth of eighty arpents from the river. To that extent the grant was complete. Had the holders of it confined their claim to the

land thus limited, there would not probably have been much, if any, controversy with the United States.

But owing to the use of the words "all the vacant land" lying in the rear of the forty arpents, in the recital of the grant, a pretension was set up, after the cession of the country to the United States, that the grant covered all the vacant land within the lines of the original concession extended to the limits of the possessions of the Spanish Crown. This pretension was so obviously preposterous, that it would not merit consideration, but for the bitter and protracted controversy to which it gave rise. The petition by Conway for a grant of the land in the rear of his forty arpents, though asking for all the depth which might be vacant, was made simply to secure all such land to the ordinary and well understood depth of forty additional arpents, from which he might obtain timber for fuel, fences, and other uses of his plantation. The object of reserving from grant to others the land in the rear of proprietors on the river, according to the custom obtaining in the province, was, as before stated, simply to give facilities to them in the use and improvement of their river plantations. The original concession to Conway and Latil embraced less than four thousand acres. The land claimed under the second grant to Conway exceeds one hundred and eighty thousand acres, an augmentation for a timber privilege which could never be allowed except upon the clearest language, admitting no other reasonable construction. The words of the recital in the grant are necessarily controlled by the usage of the country, which limited the extent of such second grant, as already mentioned. If not thus limited, no means existed for ascertaining its extent, and it was therefore void for uncertainty. The conjectural estimate of the distance of the cypress trees, stated to be, owing to the manner in which the lands were cleared, about a league and a half from the river, is too vague to affect the boundaries of the grant against the force of the general usage. In the Spanish law, as at the common law, grants furnishing no available means of identifying the land were necessarily inoperative and void. If the instrument executed by the governor was intended to transfer all the lands between the boundary lines of the original grant,

extended indefinitely whenever, as alleged in the complaint, it might "suit the convenience or interests" of Conway, it was a void act. He possessed no such unlimited authority to alienate the public lands of Spain.

The Territory of Louisiana was ceded by Spain to France in October, 1800, and by France to the United States on the 30th of April, 1803. It was formally transferred on the 20th of December following. It was stipulated by the treaty of cession that the inhabitants should be incorporated into the Union and admitted as such as soon as possible to the rights of citizenship, and that in the mean time they should be maintained and protected in the free enjoyment of their liberty, property and religion. The stipulation as to property has been held to embrace all titles to lands, whether legal or equitable, perfect or imperfect. In *Soulard* v. *United States*, this court said: It " comprehends every species of title, inchoate or complete. It is supposed to embrace those rights which lie in contract: those which are executory, as well as those which are executed. In this respect the relation of the inhabitants to their government is not changed. The new government takes the place of that which has passed away." 4 Pet. 511, 512; see also *Hornsby* v. *United States*, 10 Wall. 224.

After the cession in April, 1803, Congress, in anticipation of the delivery of the Territory, passed the act of October 31st, 1803, 2 Stat. 245, to enable the President to take possession of it, and for its temporary government. The act provided, among other things, that until the expiration of the then existing session of Congress, unless provision for the temporary government of the Territory should be sooner made, the military, civil, and judicial powers, exercised by the officers of the existing government, should be vested in such person or persons, and should be exercised in such manner, as the President might direct for maintaining and protecting the inhabitants of Louisiana in the full enjoyment of their liberty, property, and religion. Under this law the President appointed William C. C. Claiborne, of Mississippi, governor of Louisiana. Soon afterward a petition was presented to him by William Donaldson, William Marriner, and Patrick Conway for a survey of the

land known as the Houmas, they representing themselves to be its owners, and stating that they were desirous of ascertaining its outlines and boundaries with such precision as to avoid any interference with the proprietors of neighboring grants, and thereby prevent disputes; and praying that he would permit William Marriner, or such other person as might be appointed for that purpose, to survey the tract and mark the boundaries; and that he would direct the proprietors of adjoining patents to show their boundaries to the surveyor, and the commander of the district to protect him from unlawful disturbance in the prosecution of his work. Upon this petition the governor made the following order : " The proprietors of land adjoining the tract within mentioned are requested to show their respective boundaries, and the commandant of the district, if necessary, will extend to the surveyor his protection." The petition and order are without date, and it does not appear what was done, if anything, under the order, except what may perhaps be inferred from a plat of a survey subsequently prepared by one Lafon in 1806, and filed with the register of the land office with notice of the claims of Conway and others. Of this plat we shall presently speak. It is assumed in the bill of complaint and in the argument of counsel, that the survey was made under the authority of the governor by persons appointed by him for that purpose, and that the tract was subdivided by them into three separate parcels, designated after those who at the time had become owners thereof, the first or northern one of which being called the Donaldson and Scott tract, the second or middle one the Daniel Clark tract, and the lower or southern one the William Conway tract.

On the 26th of March, 1804, Congress passed an act dividing Louisiana into two Territories, one of which was called the Territory of Orleans, the other the District of Louisiana. The former territory embraced the land covered by the Houmas grant. The act provided for a government for each of them. The fourth section prohibited the governor from interfering with the primary disposal of the soil, or with claims to land within it. 2 Stat. 283, 287. On the 2d of March, 1805, Congress passed an act for ascertaining and adjusting the titles and

claims to lands within the Territories.  2 Stat. 324.  It provided that the Territory of Orleans should be divided into two districts in such a manner as the President should direct, for each of which a register was to be appointed.  The two districts into which the Territory was accordingly divided were termed the Eastern and Western districts.  The Houmas grant was in the Eastern district.  The act permitted persons claiming lands in the Territories " by virtue of any legal French or Spanish grant made and completed before October 1st, 1800, and during the time the government which made such grant had the actual possession of the Territories," and required persons claiming lands by virtue of a registered warrant or order of survey, or by any grant or incomplete title bearing date subsequent to October 1st, 1800, to deliver before March 1st, 1806, to the register or recorder of land titles of the district, a notice stating the nature and extent of their respective claims, together with a plat of the tract or tracts claimed, and to deliver to such officer for record the written evidence of their titles, which were to be recorded by him; except where lands were claimed under a complete French or Spanish grant, it was only necessary to record " the original grant or patent, together with the warrant, or order of survey, and the plat."  Their evidence or deeds were to be deposited with the register or recorder, to be laid before the board of commissioners, for the creation of which the act also provided.

It declared that two persons to be appointed by the President for each district of the Territory of Orleans should, together with the register or recorder of the district, be commissioners for the purpose of ascertaining, within their respective districts, the rights of persons claiming under any French or Spanish grant, or by the incomplete titles mentioned.  The board, or a majority of its members, was authorized to hear and decide, in a summary manner, all matters respecting the claims presented to them; to administer oaths, compel the attendance of witnesses and the production of the public records in which grants of land, warrants, or orders of survey, or other evidences of claims to land, derived from the French or Spanish governments were recorded; to take transcripts of them or any part

of them, and to have access to all other records of a public nature, relating to the granting, sale, or transfer of land; and to decide, in a summary way, according to justice and equity, on all claims filed with the register or recorder in conformity with the act, and on all complete French or Spanish grants, the evidence of which, though not thus filed, might be found on the public records of such grants; and that their decisions should be laid before Congress, and be subject to its determination.

For this latter purpose the clerk of the commissioners was required to prepare two transcripts of the decisions in favor of the claimants, each to be signed by a majority of the commissioners, one of which was to be transmitted to the surveyor-general of the district, and the other to the Secretary of the Treasury. And the commissioners were required to make to the Secretary a report of the claims rejected, with the evidence offered in their support; and he was required to lay the transcripts and reports before Congress at its next session. Under the act the claimants of the Houmas tract delivered to the register of the land office at New Orleans notices of their respective claims to the land which they asserted was covered by the grant to Maurice Conway made by Governor Galvez, June 21st, 1777; Donaldson and Scott to the upper subdivision, Daniel Clark to the middle subdivision, and William Conway to the lower one. Each of these claimants deduced his title from Maurice Conway, and accompanied his notice with a plat of a survey by one Lafon, to whom reference is made above. These plats do not purport to have been prepared entirely from his own surveys, but chiefly by reliance upon the surveys of others. In the certificate given to Donaldson and Scott, which bears date December 28th, 1804, he describes himself as a surveyor commissioned by Governor Claiborne, though not for any particular survey; and certifies to the plat from a survey made by Marriner and from measurements by himself on the river Iberville. In the certificate given to Daniel Clark, which bears date September 25th, 1805, he certifies from surveys of Marriner and measurements of his own on the river Amite and environs of Galveston, a village on that river. In the

certificate to William Conway, which bears date February
20th, 1806, he describes himself as deputized by one Isaac
Briggs, surveyor-general of lands south of Tennessee, and
certifies to the plat from surveys executed by Andry in 1804,
and by himself on the river Amite in 1803.   These plats cover
all the land embraced within the lines of the original purchase
by Conway and Latil from the Indian tribes in 1774, extended
back, not only so as to include the additional arpents surveyed
by Andry in 1776, and granted by Governor Galvez in 1777,
but all the lands beyond these to the limits of the Spanish
possessions, several miles distant from the river, and embracing
over 180,000 acres.   They possess no official character, and
have no greater effect as evidence than any private surveys
made at the request of claimants.   The notices of the claims
thus delivered to the register of the land office were by him
laid before the the board of commissioners.   The board con-
firmed the claims, following in its decree the description of the
land given by the claimants, but not referring to the plat of
Lafon.   The notice of the claim of William Conway was pre-
sented to the board February 28th, 1806, and is as follows:

"*Notice of the claim of William Conway, of the County of
Acadia, in the Eastern District of the Territory of Orleans.*

"William Conway claims a tract of land situated in the county
aforesaid, at the place called Houmas, on the left bank of the
Mississippi, containing twenty-two and a half arpents in front on
said river, with an opening towards the rear of 60 degrees and 45
minutes, the upper line running N. 9° 15 E., three hundred and
fifty-one arpents, and the lower line directed N. 70° E., and
measuring four hundred and fifty-five arpents.   Bounded on the
upper side by Daniel Clark, and on the lower by Simon Laneau,
as more fully described in the annexed plat, executed by Bar-
tholomew Lafon, deputy surveyor, dated February 20th, 1806.

"Part of said land, that is to say, seventeen arpents front, were
originally granted with a greater quantity by the Spanish govern-
ment to Maurice Conway, by virtue of a complete title issued on
the 21st day of June, 1777, as per document No. 1, and the same

conveyed to the claimant by the grantee aforesaid, on the 27th day of October, 1786, as per document No. 2.

" And the five and a half arpents remaining to the complement of the 22½ aforesaid were transferred to the claimant, on the 27th day of March, 1781, by Pierre Part, who had purchased the same at the public sale made before Louis Joudice, commandant of the parish of La Fourche of the estate of the late Joachim Mire (alias Belony), on the 7th day of December, 1778, ' as it evidently appears by the authenticated document hereunto annexed, No. 3.'

" It is to be observed that, although the deed of conveyance of Maurice Conway aforesaid contains 27 arpents front, the claimant only possesses seventeen, having disposed of the other ten in favor of Daniel Clark.

                                        " WILLIAM CONWAY."

The decree of confirmation was made by the board on the 3d of March, 1806, and is as follows :

" No. 125.   W. Conway.

MONDAY, 3d March, 1806.

" William Conway, aforesaid, claims a tract of land situated in the county of Acadia, aforesaid, at a place called Houmas, on the left bank of the Mississippi, containing twenty-two and a half arpents in front, with an opening towards the rear of sixty degrees, forty-five minutes, the upper line running N. 9° 15″ E. three hundred and fifty-one arpents, and the lower line directed N. 70° E., and measuring four hundred and fifty-five arpents, bounded on the upper side by Daniel Clark's land, and on the lower side by land of Simon Laneau ; it appearing to the board from a patent or complete title exhibited that seventeen arpents of front were, together with a greater quantity granted by the Spanish Government to Maurice Conway, 21st June, 1777 ; and it appearing that the five and a half arpents of front remaining of the land aforesaid were purchased by Pierre Part at the public sale of the estate of the late Joachim Mire (alias Belony), on the 7th day of December, 1788 ; and it further appearing to the board from two several instruments of conveyance offered in testimony that the two tracts of land, af'd, have been conveyed to the present claimant, the board do hereby confirm his claim, aforesaid."

The confirmations of the claims of Donaldson and Scott and of Daniel Clark were substantially in the same form, differing only as to the lines within which it was alleged the lands lay. The claims were respectively designated as No. 133 and No. 127. The decisions were made before one of the commissioners had become a member of the board, and as soon as he qualified he dissented from them. This fact will be important in considering the effect of the legislative confirmation in 1858.

As required by the act of 1805, a transcript of the favorable decisions rendered by the commissioners, including these three, was duly forwarded to the Secretary, who, in January, 1812, transmitted the same to Congress. The decisions themselves were merely an expression of opinion by the commissioners. They had no effect upon the title of the claimants until approved by Congress. Until then they amounted only to a recommendation of their favorable consideration by the government. No recognition of them by Congress was made until the passage of the act of June 2d, 1858, of which we shall hereafter speak. In the mean time efforts were constantly made to procure a recognition of their validity by the officers of the land department, but without success, except in one instance—that by Secretary Bibb in 1844. With that exception and the decision of the two land commissioners, no officer of the government has ever recognized the validity of the grant by Governor Galvez to the extent claimed by Conway and parties deducing their interest from him.

On the 14th of January, 1829, the Surveyor-General of Mississippi, *ex officio* Surveyor-General of Louisiana, addressed a communication to the Commissioner of the General Land Office, enclosing a rough plat of the Houmas grant showing its locality, the extent of land claimed, and its interference with other grants of the Spanish government. In it he stated that, previously and subsequently to the date of the grant, the Spanish authorities had made other grants to a number of individuals within the limits alleged to be covered by the claim of Conway, and that he believed no pretension to the present limits was made until after the right to the land had vested in the United States. He also stated, as another reason why the grant could

not be extended to the Amite River, that neither the petition
of Conway, the decree of the governor, nor the proceedings of
the surveyor called for or exhibited any such boundaries; and
that it was well known to be the custom of the Spanish sur-
veyors, in all cases where a grant called for specific boundaries,
to exhibit them in a plat of survey.   He then considered where
the boundaries were to be established, and he suggested that,
if we were to be governed by the customs of the Spanish
government, we should run off such a depth as would extend
the upper line until it intercepted an older grant.   This he was
of opinion would strictly conform to the decree of the Spanish
governor, although it would not give the claim a depth of
eighty arpents, which he thought was designed if the land was
found to be vacant.   He then asked instructions to guide him,
as surveyors were engaged in the immediate vicinity of the
grant.

To this communication the Commissioner of the General
Land Office replied, under date of February 17th, 1829, express-
ing the opinion that the grant made by Galvez in 1777 was so
vague in its terms, both as to boundary and quantity, that it
would be indispensably necessary for courts of justice to inter-
fere for the purpose of defining and designating both; that the
claim set up to all the vacant land which might be embraced
between the northern and southern boundaries of the original
grant, if it were extended in the course called for, led to such
absurdities, that he thought it impossible that the courts could
sanction it; that the object for which the grant was asked and
obtained would, therefore, be the leading consideration on
which the courts would probably decide the question; and, in
so deciding, they might possibly confine the grant either to
the limits of the survey actually made by Andry, or to eighty
arpents, the usual extent granted when the front grant was
deficient in timber, or to the distance of one league and a half,
as requested in the petition; and, that, if this last limitation
was adopted, full scope would be given to the court to exercise
its discretion; and, if the grant could be adjudged to exceed
these limits, it must extend to the utmost boundary of Loui-
siana.   He, therefore, decided that a league and a half should

not be open to entry, and gave instructions accordingly. Lands beyond that depth were, therefore, treated as public lands, and numerous entries of them were made at the district land office.

Before this correspondence between the surveyor-general and the land commissioner, General Wade Hampton, of South Carolina, had acquired title to the claim made by Donaldson and Scott, and to that of Clark; and, he having died, his heirs, through J. S. Preston, one of them, in June, 1836, applied to the land office for a patent, and requested, if it could not be granted, that the land within the claims should be withheld from sale, and that patents should not be issued for the parcels already sold. To this application the commissioner, Mr. Ethan A. Brown, replied, addressing his communication to a senator from Louisiana, through whom the application was presented, stating that inasmuch as he did not consider the claims, to the extent insisted on before the board of commissioners, recognized by the United States, the office could not issue a patent therefor; but as the law did not authorize the sale of any lands, the claim to which was filed with the commissioners for investigation, until the final action of Congress thereon, he had directed the register of the land office at New Orleans to withhold from entry all the lands within the limits of that claim, as described in the reports of the commissioners, and to report a list of all the lands sold within those limits, in order that patents might not be issued therefor.

Notwithstanding this direction of the Commissioner, it would seem that the land officers at New Orleans approved of pre-emption settlements on the land claimed, and floats located there; and in the following year, 1837, complaints of these proceedings were made to the General Land Office by Mr. Preston, on behalf of the heirs of Hampton. A communication from him on their behalf was also laid before the Senate, in which he prayed that the Commissioner should be directed to refuse titles to those who had purchased by pre-emption or otherwise, by refunding the money paid and taking up the certificates of entry as far as possible, and also that he should be directed forthwith to issue a patent for the whole claim. The

memorial was presented and referred to the Committee on Private Land Claims, but nothing came from it.

In the following year, 1838, another effort was made to obtain the action of Congress on the subject, which also failed. And from year to year afterwards communications were made by the claimants, or persons acting for them, to the land department to secure favorable action, and a recognition of the validity of their claims, but always without success until 1844. It would serve no useful purpose to state with particularity the nature and contents of these communications. They are referred to now merely to show the general notoriety given to the pretensions of the claimants, and the princely domain which, under a grant of less than four thousand acres on the river, was claimed by the grantee to enable him to obtain timber for his fences and fuel, and for other uses of his plantation. The general knowledge of the extravagant character of the claims, which may be inferred from these proceedings, may have had something to do with the phraseology used in the attempted confirmation in 1858, which we shall hereafter consider.

Some time in the year 1841 a new idea as to their rights seems to have occurred to the claimants, namely: that the claims were confirmed by the act of Congress of April 18th, 1814, 3 Stat. 139. Accordingly, in August, 1841, application was made to the Commissioner of the General Land Office on behalf of Conway for a patent of his claim, and in May, 1844, a similar application was made on behalf of Hampton's heirs for a patent of their claims. That act provided that certificates of confirmation to land lying in the land districts of Louisiana, which had been issued under the act of March 3d, 1807, and directed to be filed with the proper register of the land office within twelve months after date, and certificates on claims included in the transcript of decisions made in favor of claimants and transmitted to the Secretary of the Treasury, should be delivered, where the lands had not been already previously surveyed, to the principal deputy surveyor of the district and be surveyed; and for the tracts surveyed patents should be issued by the Commissioner of the General Land Office. As the

claims under the Houmas grant were included in the transcript of favorable decisions transmitted to the Secretary of the Treasury, and by him laid before Congress, it was contended that they were thereby confirmed.   Mr. Bibb, the Secretary of the Treasury, and head of the land department under the then existing law, concurred in this view ; and his opinion was presented in a communication to the Commissioner of the General Land Office under date of August 12th, 1844.   In accordance with his opinion patents were issued to the heirs of Hampton for the claims presented by Donaldson and Scott and by Daniel Clark.   This action of the Secretary and the issue of the patents gave rise to much unpleasant comment ; and soon after the meeting of Congress in December following a resolution was passed by the Senate calling upon the Secretary to communicate a copy of his opinion directing such issue, and of opinions by other officers connected with the General Land Office in relation to the claims, and of the surveys and transcripts of confirmation.

As application had also been made for a patent of the Conway claim, the House of Representatives, on the 7th of January, 1845, passed a joint resolution prohibiting the issue of patents or other evidences of title upon the Houmas grant until the further action of Congress.   The resolution having been sent to the Senate was there amended ; but upon being returned to the House on the last day of the session it was not taken up, and thus failed to become a law.   The Commissioner of the Land Office, in view of this resolution, treated the application for a patent of the Conway claim as a suspended case. After the adjournment of Congress applications for a patent were renewed ; but the Commissioner declined to act upon them, in face of the resolution of the two Houses, which failed to become a law only because of disagreement as to its terms, but not as to its general purpose to suspend the issue of a patent.

In June of the following year, 1846, the two Houses of Congress by a joint resolution directed the Attorney-General to examine the evidences of title founded upon the Houmas claims and to report to the President his conclusions ; and requested

him, if they were against the legality of the patent issued or to be issued, to bring suits to have the same judicially determined. In response to this resolution the Attorney-General made an extended examination of the title, stating in his report all the various proceedings that had been taken in respect to it, and giving as his conclusion that the Houmas grant passed a title only to a tract forty-two arpents deep from the river, and that the claimants had no legal or equitable right to any land beyond that depth; and that the act of April 18th, 1814, under which patents had been issued for two of the claims, authorized patents only in cases of confirmation under the act of 1807, which did not embrace more than one league square. In thus construing the terms of the grant and limiting its extent it is evident that the Attorney-General was governed by the rules of the common law, rather than by the usages of the Spanish government applicable to the case. Upon this report the President directed that suits in equity be brought in the Circuit Court of the United States to cancel the patents. In one of them a decree was rendered in 1856 declaring the patent upon the claim to Daniel Clark void, on the ground that the case was not within the act of 1814, the court avoiding the expression of any opinion as to the validity or extent of the claim. By a decree rendered within the last few years the patent upon the claim of Donaldson and Scott was also adjudged invalid.

This narrative brings us to the act of the 2d of June, 1858, 11 Stat. 294, entitled "An Act to provide for the location of certain confirmed private land claims in the State of Missouri, and for other purposes."

Its second section enacted,

"That the decisions in favor of land claimants made by P. Grimes, Joshua Lewis, and Thomas B. Robertson, commissioners appointed to adjust private land claims in the eastern district of the Territory of Orleans, communicated to the House of Representatives by the Secretary of the Treasury, on the 9th day of January, one thousand eight hundred and twelve, and which *is* [are] found in the American State Papers, Public Lands (Duff Green's edition), volume two, from page two hundred and twenty-four to three

hundred and sixty-seven, inclusive, be, and the same are hereby, confirmed, saving and reserving, however, to all adverse claimants the right to assert the validity of their claims in a court or courts of justice : *Provided, however,* That any claim so recommended for confirmation, but which may have been rejected, in whole or in part, by any subsequent board of commissioners be, and the same is hereby, specially excepted from confirmation."

Its third section enacted,

" That the locations authorized by the preceding section shall be entered with the register of the proper land office, who shall, on application for that purpose, make out for such claimant, or his legal representatives (as the case may be), a certificate of location, which shall be transmitted to the Commissioner of the General Land Office ; and if it shall appear to the satisfaction of the said Commissioner that said certificate has been fairly obtained, according to the true intent and meaning of this act, then, and in that case, patents shall be issued for the land so located as in other cases."

The passage of this act at once excited great commotion among a large number of persons who occupied the land claimed under the Houmas grant, amounting, as stated by counsel, to nearly five thousand. Measures were at once taken to prevent its provisions being carried out. On the 3d of March, 1859, Congress passed a joint resolution suspending the operation and effect of the second section until the end of the 36th Congress, so that no patent or patents should be issued, nor any action be had by the executive branch or department of the government, or any officer or agent thereof, by virtue of it. 11 Stat. 442. And, on the 21st of June, 1860, Congress passed an act repealing the second section, and declaring that it refused to confirm to the claimants under the Houmas grant the lands embraced in the certificates, No. 125 to William Conway, No. 127 to Daniel Clark, and No. 133 to Donaldson and Scott. 12 Stat. 866. The principal questions for our consideration arise upon the construction of the first of these acts ; and the effect of its repeal upon the confirmation of the claims. In

the first place, it is to be observed, that the decisions which are confirmed by the second section of the act of 1858 are not described as those of the board of commissioners, nor of the commissioners generally, appointed to adjust private land claims in the eastern district of the Territory of Orleans, which designation might be taken as referring to the board as a special tribunal; but as those rendered in favor of the claimants by the three commissioners designated by name. There were good reasons for this. The three decisions which relate to the claims under the Houmas grant were made by only two of the commissioners. The third commissioner, who joined in the other decisions, was not a member of the board when these three were rendered; but as soon as he became a member he expressed his dissent from them. This dissent accompanies the report of the decisions made to the Secretary of the Treasury, and laid by him before the House of Representatives, and is found in the volume to which reference is made, immediately following the three decisions, in these words:

"The three foregoing decisions were made before I became a member of the Board. As far as I am authorized to do so, I dissent from the same.

"THOMAS B. ROBERTSON."

To the volume of State papers mentioned every one would be obliged to look in order to learn what claims were confirmed; and there this statement would confront him. When we consider the notoriety given to the extravagant claims under the Houmas grant; the continued opposition of all the officers of the government, with one exception, to a recognition of them; the failure of repeated efforts to secure favorable action from Congress; the pendency of legal proceedings authorized by Congress to vacate patents issued upon two of them; the large number of persons in possession who claimed under sales of the government, a fact which had been repeatedly brought to the attention of Congress; we are forced to the conclusion that the limitation of the act to favorable decisions made by the three commissioners was intentional, and

that they were named, *ex industria*, to exclude from confirmation the claims under the Houmas grant, which had given rise to so much controversy and litigation, and had been so uniformly denounced and repudiated.

The position of the plaintiffs, that Congress must have intended to include all reports made by the board because under the act of 1805 a majority of its members were authorized to act upon and determine the validity of claims presented, does not strike us as a logical conclusion. It would rather seem to strengthen our construction, for by naming decisions made by the three commissioners the act indicates that Congress intended to refuse a confirmation of decisions made by two of them. If it had intended to confirm all favorable decisions of the board, whether made by a majority of its members or by them all, its intention could have been expressed by simply mentioning the board, without designating its members, as had been usual where the decisions of similar boards were confirmed. The present instance is the only one, it is believed, where, in the legislation of Congress confirming grants, the names of the commissioners whose favorable action was approved have been mentioned. This departure from the ordinary language in such cases was, we think, for a special purpose. We must assume that the members, by whose vote the act became a law, fully weighed its meaning and intended what it expressed. It is also a familiar rule of construction that where a statute operates as a grant of public property to an individual, or the relinquishment of a public interest, and there is a doubt as to the meaning of its terms, or as to its general purpose, that construction should be adopted which will support the claim of the government rather than that of the individual. Nothing can be inferred against the State. As a reason for this rule it is often stated that such acts are usually drawn by interested parties; and they are presumed to claim all they are entitled to. The rule has been adopted and followed by this court in many instances in the construction of statutes of this description. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 536; *Dubuque & Pacific Railroad Company* v. *Litchfield*, 23 How. 66, 88; *The Delaware Railroad Tax*, 18 Wall. 206.

The rule is a wise one; it serves to defeat any purpose concealed by the skilful use of terms, to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies.

If the construction we thus give is sound, there is an end of the plaintiffs' case and their extravagant pretensions are dissipated. The subsequent repeal of the section affected no rights, and was justified by the fact that what was never intended by the section was claimed under it.

But if we are wrong in this construction, and we should hold that the purpose of the second section of the act of 1858 was to confirm the decisions of the three claims under the Houmas grant, though made by only two of the three commissioners instead of the three named, the case of the plaintiffs would not be advanced. The decisions confirmed the claims, that is, recognized them, as founded in justice and equity, in accordance with which the commissioners were directed to proceed, and the act of 1858 approves of those decisions. What, then, were the claims? The plat of Lafon, as already mentioned, had no official character, and was prepared by him after the cession of the country to the United States. It was not evidence of any kind. The commissioners could pass only upon evidence of title existing before the cession. If the plat, which accompanied the notice of the claims delivered to the register of the land office, was laid before the commissioners with that notice, they do not appear to have followed it, nor to have paid any attention to it in their decisions. They only confirmed the claims as described in the application of the claimants, that of Conway, for a tract on the left bank of the Mississippi, having a front of twenty-two and a half arpents, with its northern line running N. 9° 15' east three hundred and fifty-one arpents, and the lower line directed N. 70° E. and measuring four hundred and fifty-five arpents, and bounded on the upper and the lower sides by the lands of certain proprietors. If the established usages of the country, limiting the extent of the grant upon which the claims are founded, are regarded, then the confirmation is only of a tract to which the claimants have a perfect title without it. If, however, those

usages are disregarded, the claims are for land of which no quantity is given and no boundary stated, and for their ascertainment no rule is furnished. The confirmation in that case would be void for uncertainty. No court can treat a claim as conferring a right to a specific tract until its boundaries are capable of identification or have been established by a survey. A mere claim to something without form and shape or means of segregation, can have no judicial enforcement.

It is not necessary to call in question or to qualify any of the adjudications cited by counsel as to the efficacy of a legislative confirmation of a claim to land. We had occasion to speak upon that subject in *Langdeau* v. *Hanes*, 21 Wall. 521. We there said that such a confirmation was a recognition of the validity of the claim, and operated as effectually as a grant or quit-claim from the government; that if the claim was to land with defined boundaries or capable of identification, the legislative confirmation perfected the title to the tract; but if the claim was to quantity, and not a specific tract capable of identification, a segregation by survey would be required, and the confirmation would then attach the title to the land segregated. Necessarily the legislative action cannot go beyond that which is claimed. If only something without form and shape is claimed, a confirmation of the claim will amount only to a declaration that the claimant is entitled to that something, but it will not give him a standing in court against occupants of specific tracts under color of title. Here the claim confirmed, upon the theory of the plaintiff that the grant is not limited in depth to the additional forty arpents, is neither to a specific tract, nor to a specific quantity; and until both are ascertained by action of the executive officers of the government under a law authorizing such action, the court is powerless in the matter.

The confirmation, therefore, by the second section of the act of 1858, assuming that it covers the claims under the Houmas grant for an indefinite quantity back of the first concession, did not operate to vest a title to any particular land in the claimants. It amounted only to a declaration that they were entitled to something to which, when ascertained, the

government would grant them a title. As stated by counsel, the position of the government upon that theory of the grant is like that of a donor who has promised to one a gift of land when he shall make a selection of it. In such case the gift is executory until the selection is made; and until then the title remains with the donor, whom the courts cannot compel to make a conveyance. So upon that theory the act of 1860, repealing the second section of the act of 1858, is not to be regarded as the revocation of a grant, but as a declaration that the promised donation will not be made.

In any view, therefore, in which the case of the claimants is examined, we find nothing to sustain their pretensions. They have no title to the lands claimed under the grant in question, beyond the depth of eighty arpents from the Mississippi River, which the courts can recognize as a basis for action against parties in possession, holding under sales from the government. This result renders it unnecessary to notice other questions which would arise for consideration were our conclusions different.

*Judgments affirmed.*