## CHAVES *v.* WHITNEY *et al.*

*(Supreme Court of New Mexico. January Term, 1888.)*

1. PUBLIC LANDS—MEXICAN TITLE—DECISIONS OF SURVEYOR GENERAL OF NEW MEXICO.
   Under the act of congress of July 22, 1854, § 8, (10 St. 308,) creating the officer of surveyor general of New Mexico, and making it his duty to ascertain the validity and extent of all Spanish or Mexican grants of land lying in that territory, made prior to the treaty of Guadalupe Hidalgo, the decisions of the surveyor general are not binding upon the courts of New Mexico until confirmed by congress; following *Tameling* v. *Emigration Co.*, 93 U. S. 661, and overruling *Whitney* v. *McAfee*, 1 Pac. Rep. 173; same case, 3 N. M. 37.

2. SAME—EJECTMENT—WHEN LIES.
   In the absence of an actual ouster of plaintiff by defendant, or any intrusion by him upon plaintiff's actual possession, ejectment will not lie in New Mexico in favor of one claiming under a Mexican grant approved, surveyed, and recommended for confirmation by the surveyor general, but not as yet confirmed, as against one claiming under a Spanish grant submitted to that officer, but disapproved; the jurisdiction of the courts of that territory under the act of congress of July 22, 1854, § 8, (10 St. 308,) being confined, until confirmation by congress, to the preservation of the *status in quo* of the estate and parties.

Error to district court, Bernalillo county.

Ejectment by Joel P. Whitney and Franklin H. Story, defendants in error, against Jose Maria Chaves y Garcia, plaintiff in error.

*T. B. Catron* and *John H. Knaebel*, for plaintiff in error. *Fiske & Warren*, for defendants in error.

HENDERSON, J. Defendants in error brought ejectment in the court below against the plaintiff in error to recover a large body of land lying in Valencia county. The plea was the general issue. Whitney and Story relied for title upon a Mexican grant embracing the lands sued for, made to Antonio Sandoval, called the "Estancia Grant," which had been submitted to the surveyor general of New Mexico, and approved by him; it had also been surveyed and recommended to congress for confirmation. The defendant, Chaves, had possession of the *locus in quo*, claiming under the heirs of Manuel A. Otero, deceased, who in his life-time, about the year 1874, acquired possession of the property from squatters. Otero, in the years 1878 and 1879, acquired from the heirs of Bartolome Baca title to an alleged Spanish grant, made to the latter in the year 1819, covering all, or a portion at least, of the premises in controversy. Plaintiffs connect themselves through mesne conveyances with the grantee Sandoval, and the defendants with Baca. The Baca grant was not presented to the surveyor general for his approval and recommendation to congress for confirmation until 1878. It was not acted upon by that officer until 1881, when it was disapproved. The grant under which plaintiffs

claim title was made by the governor of New Mexico in 1845, and was presented by Nolan, the grantee of Sandoval, to the surveyor general of the territory, for approval and recommendation, in 1855, but it was not approved until 1873. It also appears that a short time before the grant of the premises in question to Sandoval the same governor made another grant of a similar kind, exceeding eleven square leagues in extent, which has been confirmed and patented. Baca occupied, claimed, and enjoyed the lands until his death, in the year 1834, and for many years since one of his sons has been occupying a portion of the lands embraced within the grant, claiming through him.

By agreement of counsel the court permitted each party to put in any and all documentary evidence touching the respective grants, subject to the action of the court, when such evidence should be concluded, to rule out or exclude such portions or all of such evidence as might not be relevant or competent in the trial of the issues joined in the case. Several witnesses were examined orally, for the purpose of showing possession, when commenced, and by whom; what improvements, their nature, and by whom made; the situation of the Estancia, Berrenda, and Salt springs, the waters of the Mestanas, and other boundaries named in the grants. The defendant was in possession, and claimed the premises in every direction around the Estancia spring, when the suit was brought.

At the conclusion of the evidence the plaintiffs moved the court to take from the jury the evidence offered on the part of the defendant tending to show a grant from the Spanish governor, Melgares, to Bartolome Baca, and all intermediate conveyances to him; and also all evidence tending to show adverse possession for any length of time since July 4, 1848; also all evidence in reference to an alleged grant from the Mexican government to Antonio Sandoval to a tract of land called the "Bosque del Apache." Counsel for plaintiffs, also, at the same time, submitted in writing the following motion: "The counsel for the plaintiffs request the court to instruct the jury to render a verdict of guilty." Counsel for the defendant opposed the said motion, and also submitted to the court in writing a request to instruct the jury to find the defendant not guilty. The court granted the motion of the plaintiffs to take from the consideration of the jury all the evidence indicated in the motion, and thereupon granted the request of the plaintiffs to instruct the jury to find the defendant guilty. The court also expressly held that it had no jurisdiction to determine the validity or invalidity of the said respective grants. To the rulings and decisions of the court in the several matters above mentioned defendant at the time excepted, moved for a new trial, and, upon the overruling thereof, excepted, took a bill of exceptions, and brought error.

The argument of counsel in the case has taken very wide range, and, as no exactly similar case has ever been before this court in every particular, it becomes our duty to inquire into the soundness of the positions assumed by defendants in error, as the consequences flowing from such a position will necessarily be far-reaching, and damaging to many people of the territory. That position is, in substance, as follows: That the duty of providing protection and security to the rights of citizens arising under or recognized by the treaty of Guadalupe Hidalgo of 1848, with Mexico, when the territory in question was ceded to the United States, belongs exclusively to congress in the exercise of its political power, and not to the courts; and that inasmuch as the act of July 22, 1854, creating the office of surveyor general of this territory, and conferring upon that officer power to ascertain the number, extent, and validity of all Spanish or Mexican grants of lands lying within this and other territories, made prior to the act of cession, and to report thereon for final action by congress, he is the only tribunal or authority vested with any power whatever to pass upon such claims; and that his jurisdiction is exclusive,

and his decision final until acted upon by congress, or until congress provides. some other or different mode of establishing or rejecting such grants. On the other hand, it is claimed that by the terms of the treaty of 1848 both the Mexican and his property were incorporated into and become a part of the United States, and were thereby entitled to all the privileges and immunities of an American citizen, and that the constitution of the Union is alike his shield of protection and weapon of offense in asserting his recognized property rights under the treaty; that the treaty has the force and effect of an act of congress, and affords to the courts of the country, not only the privilege of entertaining his cause when his rights are assailed in a judicial tribunal,. but that it is the absolute and imperative duty of the courts to protect such legal and clearly defined rights under the treaty when they are invaded.

Whether the one or the other of these two positions shall be adopted in whole or in part, as the correct exposition of the law arising in this case, must. depend, at least somewhat, upon the true intent and purpose of congress in passing the act in question, and to determine from a fair consideration of the scope of the whole act whether the main object was to establish a tribunal or officer, and clothe such tribunal or officer with full power to decide, not only as between a claimant and the United States, but also between adverse or conflicting claimants under the Spanish crown and the republic of Mexico, and to finally determine such controversies in such manner as to preclude the defeated parties from again litigating the same matters in the courts of the country.

Plaintiff in error assigns 13 grounds of error, as follows: (1) The failure of the court to instruct the jury as to the law of the case. (2) The granting. of the motion to exclude from the jury the evidence respecting the title under which the defendant below claimed. (3) The ruling that the statute of limitations was not available to the defense. (4) The ruling that the court has. no jurisdiction to inquire into the validity of the Sandoval and Baca grants, respectively. (5) The decision and ruling of the court that the decision of the surveyor general upon a private land claim is conclusive on the courts.. (6) The failure to let the case go to the jury for due consideration. (7) The refusal to instruct the jury to find the defendant not guilty. (8) The granting of the instruction directing the jury to find the defendant guilty. (9) The refusal to grant a new trial. (10) The court below proceeded upon an erroneous view of the law, to the prejudice of the defendants. (11) The verdict is against the law and the evidence. (12) The plaintiff in error was improperly deprived of his right to a trial by jury. (13) The verdict and judgment are for an excessive quantity of land.

The eighth section of the act of July 22, 1854, is in the following language:. "And be it further enacted that it shall be the duty of the surveyor general, under such instructions as may be given by the secretary of the interior, to ascertain the origin, nature, character, and extent of all claims to land under the laws, usages, and customs of Spain and Mexico; and for this purpose may issue notices, summon witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo of 1848, denoting the various grades of titles,. with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States," etc.

The secretary of the interior, in pursuance of the authority conferred upon him by the foregoing section, on the twenty-first day of August, 1854, forwarded to the surveyor general of this territory very full instructions as to the manner in which that officer should exercise the duties and powers conferred upon him by the act. The instructions begin in these words: "The duty which this enactment devolves upon the surveyor general is highly im-

portant and responsible. He has it in charge to prepare a faithful report of all the land titles in New Mexico which had their origin before the United States succeeded to the sovereignty of the country, and the law contemplates such a report as will enable congress to make a just and proper discrimination between such as are *bona fide* and should be confirmed and such as are fraudulent or otherwise destitute of merit and ought to be rejected. The treaty of 1848 between the United States and Mexico stipulates in the eighth and ninth articles for the protection of private property. The terms there employed in this respect are the same in substance as those used in the treaty of 1803, by which the French republic ceded the ancient province of Louisiana to the United States; and consequently in the examination of foreign titles in New Mexico you will have the aid of the enlightened decisions and the principles therein developed of the supreme court of the United States upon the titles that were based upon the treaty of cession and the laws of congress upon the subject." The security of private property for which the treaty of Gaudalupe Hidalgo stipulates is in accordance with the principles of public law as universally acknowledged by civilized nations. "The people change their allegiance, their relation to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain unchanged." *U. S.* v. *Percheman,* 7 Pet. 51. Again, in regard to the mode of proceeding by the surveyor general, he says: "Your first session should be held at Santa Fe, and your subsequent sessions at such places and periods as public convenience may suggest, of which you shall give timely notice to the department. You will commence your sessions by giving proper public notice of the same in a newspaper of the largest circulation in the English and Spanish languages, and will make known your readiness to receive notices of testimony in support of the land claims of individuals derived before the change of government." Then follows a direction to the surveyor general to give public notice that he will require claimants to file written notices setting forth the "present claimant;" the name of "original claimant;" nature of claim, whether inchoate or perfect; its date; from what authority the original title was derived, with a reference to the evidence of the power and authority under which the granting officer may have acted; locality, notice, and extent of conflicting claims, if any, with a reference to the documentary evidence and testimony relied upon to establish the claim. He is further required by such instructions to demand of every claimant an authenticated plat of survey, if a survey has been executed, or other evidence showing the precise locality and extent of the tract claimed. This, the secretary says, is indispensable in order to avoid any doubt hereafter in reserving from sale, as contemplated by law, the particular tract or parcel of land for which a claim may be duly filed, or in communicating the title to the same hereafter, in the event of a final confirmation.

The only power conferred upon the surveyor general to make a final decision or binding determination is contained in the above-quoted section of the statute of July 22, 1854. He was to be governed in his mode of procedure and principles of interpretation by the instructions of the secretary of the interior. Congress had, as we think, two purposes in view in the passage of the act. One was to ascertain the number and extent of the grants made either by Spain or Mexico under any law, usage, or custom, of either country, in which any persons had a subsisting interest at the date of the conclusion of the treaty of Guadalupe Hidalgo, in 1848, in order to separate the areas so claimed under said grants from the public domain, and to withhold the same from donation, sale, or settlement until congress could examine into the *bona fides* of such claims as were presented by the surveyor general, and to determine finally, as between the United States and the claimant, what grants were or were not within the protection and sanction of the treaty; the other was to aid congress in reaching an intelligent and just decision on these impor-

tant questions, involving as they do the private fortunes of many worthy citizens on the one side, and the public faith and honor of the government, pledged by the treaty, on the other; and for that purpose the surveyor general was commissioned to ascertain every important fact necessary to a just and fair interpretation of the terms of the treaty, and to lay his report before congress for its action. Congress reserved the right to ultimately confirm or reject any grant reported. It was not a delegation of power to the surveyor general, in the exercise of which his decisions could have the force and effect of a judicial determination. The lands covered by the grants were withheld from settlement or disposition, not until the surveyor general had acted upon them and rendered a final decision, but until congress confirmed or rejected them.

Had it been the intention of congress to delegate plenary power over the subject, so as to give to his decisions the effect of a complete and final settlement of the questions raised before him, it would have manifested that intention in explicit and decisive terms. There is nothing either in the act itself, or in the instructions, that even contemplates a final and complete determination between two opposing claimants under different sovereigns to the same land. Here is a case in point: The plaintiff in error asserts title under the Spanish crown in 1819. The defendants in error assert under the republic of Mexico in 1845. Each claim under sovereign authority. Both claimants were within the jurisdiction of the United States, and were citizens thereof when Nolan first filed his claim for examination and approval in 1855. Neither the act nor the instructions contemplate the service of process upon an adverse claimant in order to confer jurisdiction upon the surveyor general. The scheme of practice devised by the secretary of the interior to regulate the proceedings before the surveyor general does not provide in any manner whatever for bringing in adverse parties claiming an interest in the lands embraced in the grant of the claimant whose title is under investigation by that officer. While it is said that the surveyor general shall hold sessions for the purpose of discharging his duties, there is nothing analogous to a judicial proceeding in the methods employed for the exercise of his jurisdiction. There is nothing in the record of the proceeding in the case of Nolan before the surveyor general, when he procured the approval of the Sandoval grant, to show that there was any publication or notice of any kind to the heirs of Baca by which they were or could have been notified of the pendency of that claim. Nor is there anything in the act of 1854 which in terms contemplates or provides for a contest, judicial in character or otherwise, as between conflicting claimants to the same property at the same time, so as to bind and conclude the defeated party by force of the decision rendered by that officer. Notice in some form is essential to the validity of any judgment or decision the effect of which is to deprive a man of his property, to say nothing whatever of what would be "due process of law," as used in the constitution. It must be apparent that it was never intended to cut off and destroy the rights of a *bona fide* claimant under the treaty, and to bar him from asserting and enforcing his rights.

The duties devolved upon the surveyor general show that he was required to report all grants, with his decision thereon, to congress for its action. Congress has power to reject an approved grant, and to approve a rejected grant. It is in no manner bound by the conclusions reached by that officer. His findings of fact might incline congress to repudiate and reject his conclusions as not well founded. As another illustration of the views we take of the true interpretation of his act, let it be supposed, as is the fact here, that the surveyor general approves one grant and rejects the other. Congress thereafter confirms the approved grant, and a patent is issued, but in the patent the rights of all adverse claimants are left unaffected by it. This we believe is the universal rule in such cases. The rejected grant is not thereby condemned; the rights of the adverse claimant are left unimpaired by the patent. He may, if

in possession, set up such adverse claim, and have it adjudicated in some forum, unless it has been in express terms declared by congress not to be within the terms of the treaty.

The facts in the record before us show that there was no notice given to the heirs of Baca at any time after the filing of the Sandoval grant by Nolan before the surveyor general of the pendency of said claim until it was approved in 1873. It is now insisted that the approval of the Sandoval grant, although without notice to the heirs of Baca, has the force and effect of a final decision and judgment in favor of those succeeding to that title, and that until rejected or confirmed they can call upon a court of justice for the delivery of possession, and that in such proceeding no other grant title standing unapproved, whether perfect or imperfect, can be interposed by way of defense, when the right of possession is called in question. Looked at in any light, we feel constrained to hold that it was never intended by congress to give any final or conclusive effect to the act of approval of a grant by the surveyor general. His powers are inquisitorial, and his researches are made for the use of the political department in applying the stipulations of the treaty to the particular facts found in each case presented to that body for its final action. What has been said in several cases before the supreme court of the United States can be reconciled with this view. We will consider some of them.

In *Tameling* v. *Emigration Co.*, 93 U. S. 661, the court, in passing upon an act of congress confirming a grant as reported by the surveyor general of New Mexico, said: "The determination of this case depends upon the effect of the act of congress to confirm certain private land claims in the territory of New Mexico;" and after reciting the history of the legislation to settle private land titles in California, said further: "Were we now exercising appellate jurisdiction over the proceedings of a court or officer specially appointed to determine the validity and extent of the grant in question, it would be our duty to either affirm or reverse the decision, pursuant to the rules prescribed for our guidance; but congress legislated otherwise for the adjustment of land titles in New Mexico. By the eighth section of the act of 1854, (10 St. 308,) the duty of ascertaining their origin, nature, character, and extent, was expressly enjoined upon the surveyor general of that territory. He was empowered for that purpose to issue notices, summon witnesses, administer oaths, and to perform all necessary acts in the premises; he was directed to make a full report, with his decision as to the validity or invalidity of each claim under the laws, usages, and customs of the country before its cession to the United States. That report, according to a form to be prescribed by the secretary of the interior, was to be laid before congress for such action as might be deemed just and proper. It will be seen that the modes for the determination of land claims of Spanish or Mexican origin were radically different. Where they embraced land claims in California, a procedure essentially judicial in its character was provided, with the right of ultimate appeal by either the claimant or the United States to this court. No jurisdiction over such claims in New Mexico was conferred upon the courts, but the surveyor general, in the exercise of the authority with which he was vested, decides them in the first instance. The final action on each claim reserved to congress is, of course, conclusive, and therefore not subject to review in this or any other forum." The court in this case reaffirmed what had been repeatedly held by that court, that individual rights of property in the territory acquired by the United States from Mexico were not affected by the change in sovereignty and jurisdiction. They were entitled to protection whether the person had the full and absolute ownership of the land, or merely an equitable interest therein which required some further act of the government to vest in him a perfect title. The grant was reported with its boundaries, and the act confirmed it as a whole, and the court held that the entire body was vested in the patentee. The court held that the system of procedure adopted

in California was essentially judicial in character, and declared that the plan adopted here was radically different, thereby saying' that the plan was essentially unjudicial in character in New Mexico. If the proceeding before the surveyor general was not judicial in character, it was either ministerial or executive, and therefore to the decision of the surveyor general could not be given the effect claimed for it here, unless such power had been delegated in the clearest and most explicit terms, and not then unless upon notice in some form sufficient to bind the adverse interest.

In *U. S.* v. *Land Grant Co.,* 7 Sup. Ct. Rep. 1015, 1271, delivered at the October term, 1886, the court reaffirms the opinion rendered in *Tameling* v. *Emigration Co.,* 93 U. S. 662. It was contended on the part of the United States that the power of the surveyor general of this territory was limited to ascertaining the validity or invalidity of the grants reported upon by him, but the court said he had power to ascertain and determine the extent as well as the validity of grants investigated by him. Nothing was said, however, in either case to the effect that the decision of the surveyor general conclusively bound even the government, although the United States in all such cases is a party to the proceeding, and her interest guarded by the officer intrusted with the execution of the powers conferred. The United States in both cases was treated as the grantor, and the act confirming the grants as reported by the surveyor general was the source of the title.

In *Whitney* v. *McAfee,* 1 Pac. Rep. 173,[1]the supreme court of this territory, in reviewing a judgment of the district court in an action of ejectment brought by the plaintiffs in this suit against one McAfee, to recover possession of a tract of land embraced in the Antonio Sandoval grant now before us, construed the power conferred upon the surveyor general by the act of 1854. The defense was that the lands were public lands of the United States, and that he as a citizen had settled upon and located the same under the homestead laws of the United States. In construing the eighth section of the surveyor general's act of 1854, the court said: "Under the provisions of the act of congress the surveyor general of New Mexico is clothed with judicial powers and duties with reference to Mexican and Spanish grants of land made prior to the acquisition of the territory by the United States. Neither this court nor the court below has any authority to review, reverse, or modify any decision of the surveyor general as to the validity or invalidity of any such grant made in a case regularly before him. That power and authority rests with congress alone, and until reversed or modified by congress any such decision of the surveyor general is binding upon the court, and must be regarded as *res adjudicata.*" This case was binding authority upon the court below, and by reason of it some of the alleged errors complained of were committed.

Either the supreme court of the United States, in *Tameling* v. *Emigration Co.,* 93 U. S., above cited, or our own court, in *Whitney* v. *McAfee,* has taken a mistaken view of the nature of the powers conferred upon the surveyor general under the act of 1854. In the former it is said that the system of laws adopted by congress for the settlement of private land claims arising under the treaty was "essentially judicial" in character, and that adopted by the act of 1854 for New Mexico was radically different. This radical difference consists in the nature, extent, and character of the powers conferred, and we are entirely satisfied that there is nothing in the act that warrants the conclusions reached by this court in that case. While it may be true that the court correctly decided the case on the facts shown in the record, we cannot agree with the conclusions announced as to the nature of the powers exercised by the surveyor general, nor the effect to be given to his decisions. Until congress confirms his reports, they have no legal effect whatever. His findings cannot operate upon the *status* of the title. His decisions, standing alone, do not operate to confirm a previously granted estate, nor his rejection

[1]Same case, 3 N. M. 37.

diminish or destroy one previously granted. IIis decisions amount to no more than the expression of his opinions.

The case of *Slidell* v. *Grandjeans*, 111 U. S. 412, 4 Sup. Ct. Rep. 475, is directly in point on the subject of the nature and extent of the powers conferred upon the surveyor general by the act of 1854. On the fourth of March, 1804, congress passed an act dividing Louisiana into two territories, one of which was called the territory of Orleans, the other the district of Louisiana. The act provided a government for each of them. On the second day of March, 1805, congress passed an act for ascertaining and adjusting the titles and claims to lands within the territories. The act permitted persons claiming lands in the territories, "by virtue of any legal French or Spanish grant made and completed before October 1, 1800, and during the time the government which made such grant had the actual possession of the territories, and required persons claiming lands by virtue of a registered warrant or order of survey, or by any grant or incomplete title bearing date subsequent to October 1, 1800, to deliver before March 1, 1806, to the register or recorder of land titles of the district, a notice stating the nature and extent of their respective claims, together with a plat of the tract or tracts claimed, and to deliver to such officer for record the written evidence of their titles, which were to be recorded by him. Except where lands were claimed under a complete French or Spanish grant it was only necessary to record the original grant or patent, together with the warrant or order of survey and the plat." Their evidence or deeds were to be deposited with the register or recorder, to be laid before the board of commissioners, for the creation of which the act also provided. It declared that the two persons to be appointed by the president for each district of the territory of Orleans should, together with the register or recorder of the district, be commissioners for the purpose of ascertaining within their respective districts the rights of persons claiming under any French or Spanish grant, or by the incomplete titles mentioned. The board, or a majority of its members, was authorized to hear and decide in a summary manner all matters respecting the claims presented to them, to administer oaths, compel the attendance of witnesses, and the production of the public records in which grants of land, warrants or orders of survey, or other evidences of claims to land derived from the French or Spanish governments, were recorded; to take transcripts of them, or any part of them, and to have access to all other records of a public nature relating to the granting, sale, or transfer of land; and to decide in a summary way, according to justice and equity, on all claims filed with the register or recorder in conformity with the act, and on all complete French or Spanish grants the evidence of which, though not thus filed, might be found on the public records of such grants; and that their decisions should be laid before congress, and be subject to its determination. In construing the power thus conferred upon the Louisiana commission the court said: "As required by the act of 1805, a transcript of the favorable decisions rendered by the commissioners, including these three, was duly forwarded to the secretary, who in January, 1812, transmitted the same to congress. The decisions themselves were merely an expression of opinion by the commissioners. They had no effect upon the title of the claimants until approved by congress; until then they amounted only to a recommendation of their favorable consideration by the government."

It will be seen by comparing the powers conferred upon the surveyor general in the eighth section of the act of 1854 with those conferred upon the commissioners in Louisiana that the authority conferred upon the commission under the act of 1805 was as broad as that conferred upon the surveyor general. We think the interpretation of the powers of the commission, as given in the case above cited by the supreme court, ought to be conclusive upon the question of the nature, extent, and effect of the powers of the surveyor general. There is absolutely nothing in the act itself, nor in the nature of the du-

ties imposed upon the surveyor general, calling for a different interpretation of his powers in this case.

The question presented by this record, arising on the defendant's motion to instruct the jury to find him not guilty, raises a very embarrassing question touching the jurisdiction of our courts to hear and determine the controversies of this character. The Estancia spring and surrounding country had been occupied by mere squatters for a considerable period. Neither of the parties to this record had been in possession for a long time prior to 1874. It is true that one of the sons of Bartolome Baca says he had been in possession of a small portion of the lands covered by the Baca grant since 1858, but not, it is said, within that portion covered by the Sandoval grant. The Sandoval is a smaller grant lying partly, at least, within the Baca grant. Otero bought out the interests of the heirs at law of Baca 44 years after his (Baca's) death. Plaintiff in error committed no breach of the peace in getting possession of the premises. Baca had the first possession, and occupied it for 15 years, and through an heir at law was holding a portion of the lands embraced in his grant at the date of the entry by Chaves.

Following the decision of the supreme court of the United States in the *Tameling Case*, in the very language used there, "no jurisdiction over such claims in New Mexico was conferred upon the courts," but the surveyor general decides them in the first instance. What the court meant by the use of this language we cannot say; it is susceptible of two constructions. It may be that the court intended to declare that as the law now stands the whole power and jurisdiction over the subject of Spanish and Mexican land grants is committed into the hands of the surveyor general for investigation, with the reservation of the ultimate power to adopt or reject what he does by congress, and that until after the confirmation or rejection of such grants through this mode of procedure the courts have no jurisdiction whatever to hear and determine any question arising under such grants in this territory, or that congress, by the course of legislation adopted, has reserved to the political department the sole power of defining the rights of grant owners under the treaty, and to that end has withdrawn by implication all jurisdiction from the courts to interpret the treaty or define the legal rights of persons thereunder in the broad sense of general jurisdiction, involving necessarily the power and duty of the courts to construe the treaty, and define and enforce the rights of claimants as they might appear; but that, subject to the ultimate power reserved to congress, the courts would be permitted to exercise a limited jurisdiction to the extent of protecting the possession from intrusion by wrong-doers or persons having no superior title. We think the latter the more reasonable view to take, and especially so when it is provided by our local statutes that, in order to maintain ejectment, a strictly legal title need not be proven. The lands covered by the grants are not open to settlement. The claimants who acquired possession under the grants prior to 1848, and those who hold by purchase or descent from them, are entitled to possession until congress shall in some manner provide for the final settlement of the title. Until the courts are invested with full jurisdiction, all they can do is to preserve the *status in quo* of the estate and parties.

In determining some of the questions raised by the record we have had neither legislative guide nor reliable judicial precedent to aid us in solving the vexed legal problems necessarily growing out of the facts presented. We have determined that it was the intention of congress, as manifested in the act of 1854, to withhold jurisdiction from the courts as an original tribunal in which the respective rights and duties of the United States on the one part, and that of grant-owners on the other, were to be settled and adjusted. That great injury has and will result from the inefficient and unsatisfactory methods now employed to settle the grant titles in this territory is manifest to all, but the remedy, as we conceive it, lies wholly with congress. As there is noth-

ing in the record in this case to show that there was an actual ouster of plaintiffs by the defendants, or any intrusion upon their actual possession, there was nothing to confer jurisdiction upon the court. Therefore the court erred in instructing the jury to find defendant guilty.

The judgment is reversed, and the cause remanded, with direction to grant a new trial.

We concur: LONG, C. J.; REEVES, J.