OREGON & C. R. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 4, 1895.)

No. 147.

STATUTES—INTERPRETATION—RAILROAD LAND GRANTS.
    Congress, in 1870, passed an act entitled "An act granting lands to aid in the construction of a railroad and telegraph line from P. to A. and M., in the state of Oregon." The first section granted certain lands, adjacent to the line, and within 20 miles from it, "for the purpose of aiding in the construction of a railroad and telegraph line from P. to A., and from a suitable point of junction, near F., to the Y. river, near M." F. lay nearly due west from P., and in the general direction of a road from P. to A. M. lay nearly due south from F., and entirely out of the line from P. to A. The road was built from P. to F., and thence nearly at a right angle from F. to M. No other part of the road having been built within the time fixed by the granting act, congress passed an act forfeiting the granted lands adjacent to the incompleted part of the road. The secretary of the interior, in designating the lands to which the forfeiture applied, treated the lines of track from P. to F. and from M. to F. as separate roads, and the adjacent lands as bounded by lines drawn north and west at right angles to the tracks at F., excluding a quadrant adjacent to the corner at F. *Held*, that the act of congress contemplated only a single road, of which the line from F. to M. was a part, and hence that the lands adjacent to the corner at F., where the road turned, were not forfeited.

Appeal from the Circuit Court of the United States for the District of Oregon.

This was a suit by the United States against the Oregon Central Railroad Company and the Oregon & California Railroad Company to enjoin them from asserting title to certain lands claimed to have been forfeited. The circuit court rendered a decree for the complainant. 57 Fed. 426. Defendants appeal.

This is an action brought by the United States against the railroad companies to enjoin them, and all persons claiming under them, from asserting title to the lands described in the complaint, which were granted by the government to the Oregon Central Railroad Company, and assigned by the latter to the Oregon & California Railroad Company, and claimed by the United States to have been forfeited. The defendant companies answered the bill, and filed a cross bill to quiet their title to the lands. The granting act was approved May 4, 1870, and is as follows:

"That for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and from a suitable point of junction near Forest Grove to the Yamkill river, near McMinnville, in the state of Oregon, there is hereby granted to the Oregon Central Railroad Company, now engaged in constructing the said road, and to their successors and assigns, the right-of-way through the public lands of the width of one hundred feet on each side of said road, and the right to take from the adjacent public lands materials for constructing said road, and also the necessary lands for depots, stations, sidetracks, and other needful uses in operating the road, not exceeding forty acres at any one place; and, also, each alternate section of the public lands, not mineral, excepting coal or iron lands, designated by odd numbers nearest to said road, to the amount of ten such alternate sections per mile, on each side thereof, not otherwise disposed of or reserved or held by valid pre-emption or homestead right at the time of the passage of this act. And in case the quantity of ten full sections per mile cannot be found on each side of said road, within the said limits of twenty miles, other lands designated as aforesaid shall be selected under the direction of the secretary of the interior on either side of any part of said road nearest to and not more than twenty-five miles from the track of said road to make up such deficiency.

"Sec. 2. And be it further enacted, that the commissioner of the general land office shall cause the lands along the line of the said railroad to be surveyed with all convenient speed. And whenever and as often as the said company shall file with the secretary of the interior maps of the survey and location of twenty or more miles of said road, the said secretary shall cause the said granted lands adjacent to and coterminous with such located sections or road to be segregated from the public lands; and thereafter the remaining public lands, subject to sale within the limits of the said grant, shall be disposed of only to actual settlers at double the minimum price for such lands; and provided also, that settlers under the provisions of the homestead act who comply with the terms and requirements of said act, shall be entitled, within the said limits of twenty miles, to patents for an amount not exceeding eighty acres each of the said ungranted lands, anything in this act to the contrary notwithstanding.

"Sec. 3. And be it further enacted, that whenever and as often as the said company shall complete and equip twenty or more consecutive miles of the said railroad and telegraph, the secretary of the interior shall cause the same to be examined, at the expense of the company, by three commissioners appointed by him; and if they shall report that such completed section is a first-class railroad and telegraph, properly equipped and ready for use, he shall cause patents to be issued to the company for so much of the said granted lands as shall be adjacent to and coterminous with the said completed sections.

"Sec. 4. And be it further enacted, that the said alternate sections of land granted by this act, excepting only such as are necessary for the company to reserve for depots, stations, sidetracks, woodyards, standing ground, and other needful uses in operating the road, shall be sold by the company only

to actual settlers, in quantities not exceeding one hundred and sixty acres or a quarter section to any one settler, and at prices not exceeding two dollars and fifty cents per acre.

"Sec. 5. And be it further enacted, that the said company shall, by mortgage or deed of trust to two or more trustees, appropriate and set apart all the net proceeds of the sales of the said granted lands, as a sinking fund, to be kept invested in the bonds of the United States, or other safe and more productive securities, for the purchase from time to time, and the redemption at maturity, of the first mortgage construction bonds of the company, on the road depots, stations, sidetracks, and woodyards, not exceeding thirty thousand dollars per mile of road, payable in gold coin not longer than thirty years from date, with interest payable semiannually in coin not exceeding the rate of seven per centum per annum; and no part of the principal or interest of the said funds shall be applied to any other use until all the said bonds shall have been purchased or redeemed and cancelled; and each of the said first mortgage bonds shall bear the certificate of the trustees, setting forth the manner in which the same is secured and its payment provided for. And the district court of the United States, concurrently with the state courts, shall have original jurisdiction, subject to appeal and writ of error, to enforce the provisions of this section.

"Sec. 6. And be it further enacted, that the said company shall file with the secretary of the interior its assent to this act within one year from the time of its passage; and the foregoing grant is upon condition that said company shall complete a section of twenty or more miles of said railroad and telegraph within two years, and the entire railroad and telegraph within six years, from the same date."

The act of forfeiture was approved January 31, 1885, and is as follows:

"An act to declare forfeiture of certain lands granted to aid in the construction of a railroad in Oregon.

"Section 1. That so much of the lands granted by an act of congress entitled 'An act granting land to aid in the construction of a railroad and telegraph line from Portland to Astoria and McMinnville, in the state of Oregon,' approved May fourth, eighteen hundred and seventy, as are adjacent to and coterminous with the uncompleted portions of said road, and not embraced within the limits of said grant for the completed portions of said road, be, and the same are hereby, declared to be forfeited to the United States and restored to the public domain and made subject to disposal under the general land laws of the United States as though said grant had never been made.

"Sec. 2. * * *"

The facts are stipulated by the parties, and it appears, to quote from the opinion of the circuit court, that "the line of the railroad from Portland to the point of junction near Forest Grove runs directly west, and the road from such point of junction runs nearly south to the Yamkill river. In July, 1871, the Oregon Central Railroad Company filed in the office of the secretary of the interior a map showing the location of the line of the road from Portland to a point on the Yamkill river, near McMinnville, and also from a junction near Forest Grove towards Astoria, to a point one mile north of the summit of the range of hills dividing the Tualatin from the Nehalem Valley, a distance of 20 miles. The map of definite location from Astoria to said point was filed June 23, 1876. On February 16, 1872, the secretary of the interior accepted the first 20 miles of completed road, commencing at Portland, and on June 23, 1876, he accepted 27½ miles, from the 20-mile post to the Yamkill river. On September 8, 1880, the Oregon Central Railroad Company sold and conveyed to the Oregon & California Railroad Company its said road, and all its title and right to the said land grant. On July 8, 1885, the commissioner of the general land office issued instructions to the local land officers, at the land office at Oregon City, for their guidance under the forfeiture act, with which was inclosed a diagram showing the limits of the forfeited lands, and of that part of the grant not affected by the forfeiture act. This diagram shows that the road runs from Portland west to Forest Grove, where it turns almost at a right angle, and runs

south to McMinnville. From Forest Grove two lines are drawn,—one due north, the other due west,—both terminating at the 20-mile limits. The granted lands lying within the quadrant formed by these lines and the 20-mile limits, and also the lien lands within such lines and the 25-mile limits, are designated on the diagram as 'Forfeited.' The diagram also shows the forfeited lands on the line from Forest Grove to Astoria. These instructions

were affirmed by the secretary of the interior on April 5, 1887. The receiver in charge of the Oregon & California Railroad Company duly protested against the action of the land department so far as it related to the granted lands within the quadrant."

The circuit court gave judgment for the United States.

William F. Herrin and Joseph D. Redding, for appellants.

George H. Williams and John M. Gearin, for the United States.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

McKENNA, Circuit Judge, after stating the facts, delivered the opinion of the court.

The grant is made in section 1, the other sections being but provisional and subsidiary.    It is as follows:

"That for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and from a suitable point of junction near Forest Grove to the Yamkill river, near McMinnville, in the state of Oregon, there is hereby granted to the Oregon Central Railroad Company * * * the right of way through the public lands, * * * and each alternate section of the public lands, not mineral, * * * to the amount of ten such alternate sections per mile, on each side thereof. * * *"

By this section, plaintiff contends, two roads are described,—one beginning at Portland, and terminating at Astoria; the other beginning at Forest Grove, and terminating at McMinnville.    The defendants contend that only one road is described, beginning at Portland, and having termini, respectively, at Astoria and McMinnville.    The controversy, therefore, is clearly defined, and the parties have warmly and ably supported their respective sides.    The importance of any decision is manifest, and we have given the case a commensurate care and attention.

For the contention of plaintiff, there is the authority of the late Justice Lamar when secretary of the interior, and the decision of the circuit court, and the most convenient, if not the clearest, consideration of the case, will be a comment on their reasoning, weighed with independent views of the statutes.    The learned secretary held that the section should read:

"A railroad and telegraph line from Portland to Astoria, and a railroad and telegraph line * * * from a suitable point of junction near Forest Grove to the Yamkill river, near McMinnville."

To attain this result, he disregarded the title of the act (which we shall refer to hereafter) and all its designations, and concentrated attention solely to the words "point of junction," which he declared "were invariably used in railroad language to indicate a point where two or more railroads join, and not to designate points between termini of a single road."    This, certainly, is very abstract, and forces the inquiry, is it permissible?    If the definition be granted (and the learned secretary may not have precisely distinguished between the word "junction" and the phrase "point of junction"), a presumption of its use is not irresistible against every evidence, and it is a well-settled canon of construction that all the words of a statute must, if practicable, be given effect.    The object of the congressional grant was railroad communication between certain points.    If chiefly from Portland to McMinnville and Astoria, a line between these points, even via Forest Grove, must either be circuitous, or deflect from Forest Grove and return to it, for McMinnville and Astoria are not in the same direction from Portland.    If circuitous, there would be no confusion about its singleness, however near its different parts might approach, and their union in a single track from Forest Grove to McMinnville was certainly competent for congress to permit or provide and regard it and the part between Portland and Astoria as one road.    Between such parts there must be a point of junction; indeed, more strictly so than between independent roads; and, if the language of the act is sufficient to express either, the most that can be said is that it is ambiguous,

and an attempt must be made to resolve the ambiguity by a resort to other parts of the act. Examining them, we find that the title of the act describes but one road, with its initial point at Portland. It is "An act granting lands to aid in the construction of a railroad and telegraph line from Portland to Astoria and McMinnville, in the state of Oregon." The description in section 1, if we transpose some of its words, is almost as definite. Making such change, it would read as follows:

"That for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria and to the Yamkill river, near McMinnville, * * * from a suitable point of junction near Forest Grove."

That the title describes but one road seems to be conceded, but it is objected that the title is no part of an act. This is true in a certain sense, but it is firmly established that the title may be resorted to as an aid to interpretation. And sensibly so. Its purpose is descriptive, and, if it receives less consideration than the body of the act, it receives enough to be some index of intention. "When the mind labors," said Chief Justice Marshall, "to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration." U. S. v. Fisher, 2 Cranch, 386. This language is repeated and the same rule announced in a number of cases. See 23 Am. & Eng. Enc. Law, 328, where they are collected.

The title, therefore, cannot be disregarded. Giving it the attention which the rule announced by the learned chief justice requires to be given to it, and interpreting it as describing one road, is it consistent with the body of the act, and the body of the act with it? We think so. The designations are "road," "railroad," and "line"; not once "roads," "railroads," and "lines." As we have already said, the grant is made in section 1, and, after the description of the road to be aided, the section proceeds as follows:

"There is hereby granted to the Oregon Central Railroad Company, now engaged in constructing the said road * * * the right of way through the public lands of the width of 100 feet on each side of said road, and the right to take from the adjacent public lands materials for constructing said road and also the necessary lands for depots," etc., "in operating the said road, * * * and, also, each alternate section * * * not mineral * * * designated by odd numbers nearest to said road. * * * And in case the quantity of ten full sections per mile cannot be found on each side of said road, * * * other lands * * * shall be selected * * * on either side of any part of said road nearest to and not more than 25 miles from the track of said road to make up such deficiency."

The references and designations in all of the other sections are also to and of one road. It is unnecessary to quote them, as they have already been given at length.

To meet the language of the statute, stress is put by counsel, and was by the circuit court, on the rule of the interchangeability of the singular and plural numbers. The court said this rule "has frequent application in the case of railroads," and further said:

"It is common to speak of a system embracing many roads as though there was but a single road, probably because of the habit of using the word 'railroad' to designate the company."

An objection to this is, if there was any such habit, there was nothing to cause its indulgence. The road and the company had to be and were accurately distinguished. Any indulgence of the habit would have produced utter confusion, and it cannot be supposed, therefore, that it influenced the minds or the language of the authors of the statute. If we may suppose congress contemplated two roads as a system, we would also have, under the provisions of the act, to suppose a grant to every mile of it; and, extending the supposition to the forfeiting act, land opposite every completed mile would be exempt from forfeiture.

It is further urged, quoting Justice Lamar's decision as secretary of the interior, "that it is well settled in legal parlance that the singular includes the plural and the plural the singular." The proposition is stated too universally. Neither can overrule the context. They are interchangeable when intention would otherwise be defeated.

The supreme court of Indiana, in Carrigus v. Board, 39 Ind. 66, construing the Code of the state, which provided that "words importing the singular number only may be applied to the plural of persons and things," said that:

"This construction is only to be given to the words of a statute or instrument when the plain and evident sense and meaning of the words to be derived from the context renders such construction necessary to give effect to the purpose of the makers of the statute or instrument."

Singleness and plurality are not the same. One railroad is not the same as two railroads, and there is certainly some presumption in favor of one being meant when one is expressed.

The court of appeals in New York, in Newell v. People, 7 N. Y. 97, says:

"Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have the right to add to or take away from that meaning."

To summarize, therefore, we find that the title of the act describes one road. A fair and unforced construction of section 1 describes one road, and all the language, references, and provisions of the act describe one road. This concurrence makes a strength of proof which, by any rule of construction we are acquainted with, cannot be resisted. If addition be needed, it is given by the act of forfeiture. Its title is "An act to declare forfeiture of certain lands granted to aid in the construction of a railroad in Oregon,"—a railroad in Oregon, not railroads; and it is described in section 1 to be a "railroad * * * from Portland to Astoria and McMinnville." In other words, the road is described by the title of the

granting act. This clearly shows that congress understood the granting act to describe one road, and make it the test and meaning of the forfeiture. And this was natural under the conditions existing at the time of its passage.

It is provided by section 2 of the granting act that:

"Whenever and as often as the said company shall file with the secretary of the interior maps of the survey and location of twenty or more miles of said road, the said secretary shall cause the said granted lands adjacent to and coterminous with such located sections of road to be segregated from the public lands."

In pursuance of this provision, the secretary of the interior, after a report by commissioners, accepted the road in sections—First, of 20 miles, to a place called "Hillsboro"; and, second, of 27 miles from thence to McMinnville. This was only competent upon the supposition that there was but one road, and it is not conceivable that congress overlooked the fact or the significance of the secretary's action.

It is asserted that the section to Astoria was the chief inducement to the grant, and a sense of the injustice is expressed of permitting the railroad company to claim that which was given as consideration for building the whole road for building a section of it. The former proposition is disputed, and the record affords us no evidence to resolve the dispute, nor is it necessary. Whatever the inducement to the grant, and whatever comment the conduct of the railroad company may bear, its rights must be measured by the terms of the act of congress. There was no preference expressed by it, and the order of construction of the parts of the road was unreservedly committed to the company.

It is further urged, however, that there is necessarily a doubt as to the meaning of the acts of congress, arising from their language and the decision of Secretary Lamar, and that such doubt must be resolved in favor of the government; and in support of this the language of Mr. Justice Field in Slidell v. Grandjean, 111 U. S. 437, 4 Sup. Ct. 475, is quoted, as follows:

"Where a statute operates as a grant of public property to an individual, or the relinquishment of a public interest, and there is doubt as to the meaning of its terms or as to its general purpose, that construction should be adopted which will support the claim of the government, rather than that of the individual. Nothing can be inferred against the state."

We think counsel makes too broad an application of the language of the learned justice. The rule it expresses is directed against putting into a statute, by presumption or inference, that which its language does not express, or where, after interpretation has been exercised, the language will bear equally two meanings. It does not mean, because a controversy can be started, there must be judicial doubt. If so, the rule would be as simple as summary, and we may well wonder at the long line of cases in which public grants have demanded and received construction by the supreme court, and the grants sustained against not only ingenious, but strong and plausible, contentions to the contrary. We have an illustration in a decision cited by both sides. Land grants came up for consideration in U. S. v. Union Pac. Ry. Co., 148 U. S. 562, 13 Sup. Ct. 724,

and the difference in the constructions contended for involved 200,-000 acres of land. The terms of the acts were ambiguous in the sense that there was controversy about them by able minds, including that of a secretary of the interior. The decision of the supreme court was, nevertheless, against the United States. We do not consider it necessary to dwell on this point further, as we deem the granting and forfeiting acts reasonably plain.

The action and opinion of the secretary of the interior in opening the disputed lands to settlement are urged upon us as a contemporaneous construction of the acts of congress. It could not be of both acts. It could only be of the forfeiting act. If there was contemporaneous construction of the granting act, it was by a former secretary of the interior when he approved the location by the company of the part of the road from Portland to McMinnville, and accepted the sections from Portland to Hillsboro, and from the latter to McMinnville. This construction was against the present contention of the United States, and the subsequent, not contemporaneous, construction of his successor, of many years' interval. A period of 15 years elapsed between the granting act and the forfeiting act. Whatever strength, therefore, there is in the rule, supports our interpretation of the former; and if it could be contended that the forfeiting act, notwithstanding, revokes the grant to the disputed lands, questions would arise which have not been submitted for our judgment, and we have no desire to volunteer in their consideration.

The appellee further contends that the government had a right to revoke the grant, because the Oregon Central Railroad Company was incorporated in 1868; and at such time, under the laws of Oregon, a corporation had power only, to quote from the statute, "To purchase, possess, and dispose of such real and personal property as may be necessary and convenient to carry into effect the object of the incorporation," and that the object of its incorporation was defined in its articles as follows:

"The object and business of the corporation shall be to construct and operate a railroad from the city of Portland through the Willamette Valley to the south boundary of the state, under the laws of Oregon and the laws of congress recently passed, granting lands in aid for such purposes."

The answer to this contention is that the company did have the power to construct a road from Portland to McMinnville, and to accept a grant in aid of it; and that, besides, it is a question for the state of Oregon, and not the United States.

In Bank v. Matthews, 98 U. S. 628, Justice Swayne, speaking for the court, said:

"Where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding instituted for that purpose."

In support of this the learned justice cited a number of cases. See, also, Cowell v. Springs Co., 100 U. S. 55.

Judgment of the circuit court is reversed, and the cause is remanded for further proceedings in accordance with this opinion.