Jones, J.,
 

 dissenting. In the case of
 
 Hubbard v. City of Toledo, 21
 
 Ohio St., 379, West, J., in the opening sentence of his opinion, said, at page 393:
 

 “In view of the magnitude of the private interests which this opinion may affect, not only in its immediate consequences, but in the future history and disposition of the public canals, we have given to the questions arising upon this record * * * the most careful consideration.”
 

 I feel constrained, for a similar reason, to write this dissent. During the time when I sat on the Fourth circuit, many litigated questions, in many respects similar to those here presented, arose between the interests of private individuals and the. state, affecting the title to the latter’s canals. In that circuit a part of the system of state canals ran through the rural and urban communities of six of its counties.
 

 If the principles announced in the syllabus are held to be the law applying to the title of the state to its canal system, I fear that in the future they
 
 *460
 
 may prove to be a serious menace to the interests of the state. We cannot blink the ultimate fact that, by its defenses here presented, the respondent is endeavoring to utilize state property, including dams, feeders, and other appurtenances owned and maintained by the state, for private profit, and for purposes not contemplated 100 years ago, when the state grant was obtained.
 

 In many cases decided by this court it has been held that the title acquired by the state to all lands and appurtenances necessary for canal improvement, whether acquired by deed, appropriation, or simple occupancy, was an unrestricted fee-simple title.
 
 Ohio ex rel.
 
 v.
 
 P., C., C. & St. L. Ry. Co.,
 
 53 Ohio St., 189, 41 N. E., 205, and State v.
 
 Snook, 53
 
 Ohio St., 521, 42 N. E., 544. As stated by the court in the first case mentioned, at page 243 (41 N. E., 216):
 

 “The only fact to be ascertained is whether the lands were in fact a portion of the canal system. How the acquisition was made is not material. The mere seizure and appropriation of a parcel of land for canal purposes, by force of the statute under which our canals were constructed, was alone sufficient to vest in the state a fee-simple title to them. Nor could any other title than one in fee simple be received by the state for lands to be devoted to a canal.”
 

 The opinion then states that mere occupation of lands by the state for canal purposes was a seizure and an appropriation of it to that purr pose. Here the possession and use by the state of the feeder was not constructive, but actual.
 
 *461
 
 The state, at all times, has been in possession and has continually maintained it.
 

 In the second case, Shauck, J., in his opinion reiterates the above principle, citing authorities in its support.
 

 The title in fee simple having been thus vested in the state, it continued to remain in the state, until divested by appropriate legislation. Governmental agencies had no power to acquire any other than a fee; that fee could not be incumbered by any contract or agreement, except by an act of the General Assembly.
 
 Hubbard
 
 v.
 
 City of Toledo, supra; Fox
 
 v.
 
 City of Cincinnati,
 
 33 Ohio St., 492;
 
 State ex rel. Atty Gen.
 
 v.
 
 Cincinnati Central Ry. Co.,
 
 37 Ohio St., 157.
 

 In the last case cited, this court, construing the power of the board of public works, under then existing statutes, said, on page 174:
 

 “The board of public works possesses no power to grant rights, easements, or privileges for private advantage, unless expressly authorized by law.”
 

 Citing various statutes authorizing the .abandoment and sale of certain sections of canals for various purposes, the court in the course of its opinion said that their adoption evidenced the opinion of the Legislature that the board had no implied power to grant easements or burdens upon public property in favor of individuals or corporations, unless “express authority was conferred by statute.”
 

 When the state of Ohio acquired from Abner Enoch, on July 28, 1825, a fee-simple title to the property in the state, it is evident that, under the authorities cited, unless there was an express
 
 *462
 
 provision therefor by state legislation, the canal commissioners had no authority to place any easements or burdens upon said property, especially where such easement or burden could be construed as having been given in perpetuity and for private profit. The deed from Enoch to the state, as shown on its face, was made under the Act of January 27, 1823, authorizing the commissioners to make application on behalf of the state, not only for grants for the construction of the contemplated canal, but for land for the purpose of aiding in its construction. No authority of law has been pointed out whereby the canal commissioners were authorized to obtain anything less than a fee-simple title; none has been shown authorizing them to place a burden upon its canal property or its easements thereto belonging. The form of the deed to the state was a printed form; the state officer covenanted to an obligation on the part of the state, if it be an obligation, which was wholly unauthorized. The deed by which the state acquired its property recites that it was given for a consideration of $1 and for ‘ ‘benefits which will be conferred upon all who own real property in the vicinity of the said canal, and upon myself in particular.” The deed recites that for that consideration Enoch “for myself and my heirs, give, grant, cede, and forever transfer to the state of Ohio, all the lands belonging to me which shall be necessarily occupied by the site of the said canal, and also by the site of the towing paths, feeders, aqueducts, reservoirs, spoil banks, and culverts connected therewith. (All water privileges reserved to myself as to mill seats, etc.) ”
 
 *463
 
 So that the state secured a fee-simple title, not only by the terms of the grant from Enoch, but by its actual occupation of the feeder and of the water -flowing through the feeder from the river to the canal. When the feeder under consideration was appropriated by the state, Abner Enoch,^ the original proprietor and owner thereof, was entitled to compensation. Had an appropriation proceeding been instituted for its acquirement, that compensation would cover merely the damages ensuing to the owner under the conditions then existing. Damages for future contingent value of his claimed right under entirely different conditions prevailing 100 years later would not have been within the limits of his compensation. . ________.. •
 

 Under the authorities heretofore and hereafter cited, I am unable to bring myself in accord with the connotation in the syllabus that the canal commissioners could accept a grant of land for canal purposes upon which any burden by way of upkeep and maintenance in favor of the grantor could be imposed. If this be the character of Enoch’s grant, then, quoting from the opinion of Chief Justice Johnson in
 
 State, ex rel. Fanger,
 
 v.
 
 Board of Public Works,
 
 42 Ohio St., 607, 615:
 

 “The state would be compelled to maintain her canals at any sacrifice for the exclusive benefit of the lessees of surplus water, or become the purchaser of the property of the lessee, thus making the incidental purpose paramount .to the public use.”
 

 Under the deed obtained from Enoch, under which the canal system at this point was constructed, whatever right the grantor obtained
 
 *464
 
 thereunder was merely one by way of sufferance, or permission of the state. And this was subject to revocation whenever the state saw fit to utilize its dams, its feeders, or its waters, for the purpose of navigation, or, upon abandonment of navigation, for any other purpose which the General Assembly might designate.
 

 The General Assembly has passed many acts authorizing the utilization of its canal system for other than canal purposes. Its powers in that respect have uniformly been upheld by this court in many decided cases. The limitation of power in the agencies of the state is fully discussed in the following cases:
 
 Hubbard
 
 v.
 
 City of Toledo,
 
 21 Ohio St., 379;
 
 State ex rel. Atty. Gen.
 
 v.
 
 Cincinnati Central Ry. Co.,
 
 37 Ohio St., 157, 174;
 
 State ex rel. Fanger
 
 v.
 
 Board of Public Works,
 
 42 Ohio St., 607,
 
 supra.
 

 Of the four cases reported in 58 Ohio St., 123, 50 N. E., 442, one was
 
 Wright
 
 v.
 
 Columbus, Hocking Valley do Athens B. Co.,
 
 which we think applies peculiarly to the instant case, and especially so when considered in connection with its sequel, later reported in
 
 McBroom
 
 v.
 
 Watkins,
 
 11 Ohio N. P., (N. S.), 337. Both of these case related to the same dam and to the same gristmill.
 

 Wright
 
 v.
 
 R. Co., supra,
 
 was an action wherein plaintiff, as successor in title to one Thomas Worthington, had acquired a certain
 
 “
 
 gristmill located on the Hocking river, which was supplied with water from the river by a dam constructed on it.” The consideration to Worthington for granting the right to construct the canal through his lands and to appropriate water to canal uses was that the
 
 *465
 
 grantee agreed to enlarge and forever maintain the dam so as to supply an ample supply of water, both for the canal and the mill. An inspection of the original files in this court discloses that the case was heard upon a demurrer to Wright’s petition; and an inspection of the brief of counsel for Wright discloses that, among other contentions, they relied upon the principle of estoppel. It must be noted, however, that this was purely litigation between private interests, and not between an individual and the state. Various questions arising in the case, among which was the question whether the contractual obligation of Worthington was personal or a covenant running with the land, were not necessary to be determined, for the reason that the statute granting the railroad company the right of occupancy provided that the company should not deprive abutting property owners along the canal of any vested rights, and that their remedy was at law.
 

 Later, however, when the state board of public works, after the abandonment of that part of the Hocking Canal, threatened to destroy the dam, McBroom, who was a successor in title to the gristmill, brought his action to enjoin the destruction of the dam and the water power which it furnished to his gristmill. In his petition, McBroom had alleged that, in consideration of the grant of “the right to construct said canal through said lands and appropriate the waters of the Hocking river for the purpose of supplying the canal, the state of Ohio agreed to maintain the dam across the Hocking river above said gristmill, so as to afford an ample supply of water for
 
 *466
 
 both said canal and said gristmill.” McBroom also alleged in his petition that water power had been supplied for the gristmill under said contract for a period of more than one-half century. In short, the claim of McBroom, as a successor in title to Worthington, was that the grant had been made to the grantee in reliance upon the latter’s covenant requiring it to furnish an ample supply of water to the gristmill. The trial court, as will appear from the opinion in the reported case, refused the injunction. This, of course, permitted the state to destroy the dam. The case was appealed to the Circuit Court of Hocking county, of which I was then a member. It was heard upon the same testimony adduced in the trial court. The Circuit Court rendered the same judgment as did the trial court, and refused the injunction. McBroom filed his petition in error in the Supreme Court. That court, after full hearing of a motion for an injunction to restrain the board of public works from destroying the dam (upon which motion briefs were filed), refused to issue the injunction. Thereafter the case was dismissed in the Supreme Court. The history of that case is authority for the proposition that, notwithstanding the agreement made by the grantee with Worthington, by which the latter’s gristmill was to be supplied with water, in a suit against the state to restrain the latter from the destruction of the dam, the state prevailed and relief was denied the plaintiff.
 

 However, another important question, one fraught with serious consequences, is presented in this case. It is held in the syllabus that the state of Ohio is bound by the interpretation of its canal
 
 *467
 
 commissioners as to the extent of the powers conferred upon them by the canal statutes; that it is further bound by their interpretation of the reservation in the deed referred to, wherein the commissioners held this reservation to be an exception only; and, lastly, that, the canal commissioners having so interpreted that act and the reservation referred to, having constructed a feeder in accordance with such interpretation, and having used it for the long period of time named, “such interpretation will be adhered to by this court.” If there is any doubt as to the powers of the canal commissioners to impose a perpetual burden on state property, as now claimed, or as to the meaning of the reservation made by Enoch in his deed, that doubt should be resolved in favor of the state.
 

 “It is also a familiar rule of construction that, where a statute operates as a grant of public property to an individual, or the relinquishment of a public interest, and there is a doubt as to the meaning of its terms, or as to its general purpose, that construction should be adopted which will support the claim of the government rather than that of the individual.”
 
 Slidell
 
 v.
 
 Grandjean, 111
 
 U. S., 412, 437, 4 S. Ct., 475, 487, (28 L. Ed., 321).
 

 This rule of construction peculiarly applies when we come later to construe the language employed in Enoch’s deed.
 

 In
 
 Utah Power & Light Co.
 
 v.
 
 United States,
 
 243 U. S., 389, at page 409, 37 S. Ct., 387, 391, (61 L. Ed., 791), Mr. Justice Van Devanter, citing many authorities, said:
 

 “As presenting another ground of estoppel, it
 
 *468
 
 is said that the agents in the forestry service and other officers and employees of the government, with knowledge of what the defendants were doing, not only did not object thereto, but impliedly acquiesced therein until after the works were completed and put in operation. This ground also must fail. As a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest.”
 

 To the same effect are
 
 Jeems Bayou Fishing & Hunting Club
 
 v.
 
 United States,
 
 260 U. S., 561, 564, 43 S. Ct., 205, 67 L. Ed., 402;
 
 United States
 
 v.
 
 Kirkpatrick,
 
 22 U. S., (9 Wheat.), 720, 735, 6 L. Ed., 199;
 
 Filor
 
 v.
 
 United States,
 
 76 U. S., (9 Wall.), 45, 49, 19 L. Ed., 549.
 

 The established rule is that, in doubtful cases, where public interests are involved, every construction should be resolved in favor of the public, and a doubtful or erroneous construction made by officers of the state does not bind the state.
 

 “The doctrine is well settled, in the absence of a statute to the contrary, that no laches is to be imputed to the government, and against it no time runs so as to bar its rights.
 
 [The Trustees of Greene Township
 
 v.
 
 Campbell et al.],
 
 16 Ohio St., [11],
 
 supra” Seeley
 
 v.
 
 Thomas,
 
 31 Ohio St., 301, 308.
 

 In
 
 Lee, Treasurer,
 
 v.
 
 Sturges,
 
 46 Ohio St., 153, at page 176, 19 N. E., 560, 571, (2 L. R. A., 556), Spear, J., of this court, citing authorities in support of the principle, said:
 

 “Nor can laches be imputed to the state. ‘The general principle is that laches is not imputable
 
 *469
 
 to the government; and this maxim is founded not in the notion of extraordinary prerogative, but upon a great public policy. The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions.’ ”
 

 That the state is not bound by the construction of its canal agencies as to the powers conferred upon them by legislation is distinctly held in
 
 State ex rel. Fanger
 
 v.
 
 Board of Public Works,
 
 42 Ohio St., 607. In that case, under the Canal Act of March 23, 1840 (38 Ohio Laws, p. 87), the board of public works conceived that it had the power, when covenanting with a lessee for the use of surplus water, to make an agreement with the lessee that, when the state resumed its use, it would pay the lessee the value of the lasting improvements made upon the lessee’s property. While the board of public works construed their power as power so to do, this court held that the board had no such power to contract for the payment of improvements erected upon the property. This case may be cited as authority, not only in support of the principle that the state is not bound by the unwarranted acts of its agents,‘but that laches cannot be imputed to the state under circumstances where the principle of estoppel would apply to private individuals.
 

 The principle announced in the second proposition of the syllabus is tantamount to an equitable estoppel as against the state. If the canal com
 
 *470
 
 missioners improperly construed their powers under the canal Act, or if they construed the reservation in the deed not to be a reservation, but an exception, the state is not bound by any legal limitation, nor estopped, in equity, from claiming its lawful title to this feeder.
 

 In
 
 State
 
 v.
 
 Griftner,
 
 61 Ohio St., 201, 55 N. E., 612, a case involving the title to canal lands which the state had quit using for canal purposes, and which those claiming to be the owners had improved, this court held in its syllabus:
 

 “The fee-simple title to such lands remains in the state after it ceases to use such lands for canal purposes, and the statute of limitations does not run against the state as to such lands.”
 

 See, also,
 
 Ohio ex rel.
 
 v.
 
 P., C., C. & St. L. Ry. Co.,
 
 53 Ohio St., 189, 242, 41 N. E., 205;
 
 State ex rel. Parrott
 
 v.
 
 Board of Public Works,
 
 36 Ohio St., 409, 414;
 
 State
 
 v.
 
 Cincinnati Tin & Japan Co.,
 
 66 Ohio St., 182, 64 N. E., 68.
 

 As stated on page 208 of the opinion in
 
 State
 
 v.
 
 Cincinnati Tin & Japan Co.,
 
 (64 N. E., 69):
 

 “Actions by or against the state can be brought only by express authority of the General Assembly, and the state cannot be estopped by an act of its officers, unless the state has by statute authorized such officer to act on that behalf, and then the estoppel can be no broader than the authority.”
 

 But it is contended by the respondent that by long acquiescence of the state the latter is bound, not only by the interpretation which the canal officers made as to their powers, but is also bound by the interpretation of those officers in construing the reservation contained in Enoch’s deed to be
 
 *471
 
 an exception and not a reservation. The deed of Enoch to the state, made July 28, 1825, conveyed to the state all the lands belonging to him which should be necessarily occupied by the site of the canal, and also by the site of the towing paths, feeders, aqueducts, reservoirs, etc., connecting therewith. The deed to the state was in printed form. But immediately following that grant was added this reservation, in writing: “All water privileges reserved to myself as to mill seats, etc.” It will be observed that no words of “exception” were used in this grant. The term used was that of reservation, and it is important to note (1) that the privileges reserved were those which were to come in being after the proposed construction of the canal and the reconstruction of the feeder; (2) the privileges were reserved merely to himself; and (3) they were reserved only for the purpose of “mill seats, etc.” Taking these up in their order, there are various reasons why, upon the face of this deed, this was a reservation of a future privilege and not an exception. No term implying an exception is found upon the face of this deed such as is disclosed in the case of
 
 Gill
 
 v.
 
 Fletcher,
 
 74 Ohio St., 295, 78 N. E., 433, 113 Am. St. Rep., 962. That case was a litigation between private individuals, where this court, laying stress upon the fact that words of exception were used in the deed, construed the language employed to be an exception and not a reservation. But there the estate excepted was a concrete thing in being at the time the deed was executed.
 

 The only words found in this deed are words of reservation. The language employed does not ad
 
 *472
 
 mit of any other construction, and the canal commissioners, if they interpreted it otherwise than as a reservation, exceeded their powers. As heretofore stated, if any doubt existed as to the meaning of the language, then that doubt should be resolved in favor of the state* Mr. Justice Field, of the United States Supreme Court, stating the rule, said:'
 

 “That construction should be adopted which will support the claim of the government rather than that of the individual. Nothing can be inferred against the State.”
 
 Slidell
 
 v.
 
 Or and jean, supra.
 

 This same rule is applied in a Pennsylvania case to reservations made in a deed between individuals:
 

 “A reservation in a deed is exclusively for the benefit of the grantor; it is not a grant of anything to the grantee, but is in derogation of the grant and therefore an abatement. It results that in construing an ambiguous reservation it is to be taken most strongly against the grantor, since he is the person to avoid ambiguity by speaking out. ’ ’
 
 Sheffield Water Co.
 
 v.
 
 Elk Tanning Co.,
 
 225 Pa., 614, 74 A., 742.
 

 The text-books adhere to this rule. See 18 Corpus Juris, p. 345.
 

 “When the language making an exception or reservation in a deed is doubtful, it should be construed more favorably to the grantee. Exclusion of the fee will not, therefore, be implied in construing as an exception that which the deed describes as a ‘reservation’ for a certain specified use.” 8 R. C. L., p. 1094.
 

 Not only does the deed stipulate that the water
 
 *473
 
 privileges are to be “reserved,” but tbe amended answer also alludes to the terms of the deed as a reservation. It alleges “that said Abner Enoch
 
 reserved
 
 for himself, and his heirs and assigns,” the water from said river to be taken from his own millrace, which afterwards became the feeder of the state. Sometimes the terms “reservation” and “exception” are used interchangeably, and courts are frequently called upon to construe these terms in view of the estate sought to be created by the parties. The distinction between the two is set forth in the opinion in Selden, J., in
 
 Craig
 
 v.
 
 Wells,
 
 11 N. Y., 315, 321, where he quotes approvingly the following:
 

 “A reservation is a clause in a deed, whereby the grantor doth reserve some
 
 new thing
 
 to himself out of that which he granted before. This doth differ from an exception, which is ever part of the thing granted, and of a thing in esse at the time; but this is of a thing newly created, or reserved out of a thing demised, that was not in esse before.”
 

 If we then could assume there was any doubt about the construction of these terms under the existing conditions at the time of the grant, we can readily see that the privileges reserved by the deed were not those which were in being or in esse.
 

 The amended answer discloses that the millrace and dam owned by Enoch at the time of making his deed were to be newly constructed by the state. As stated in the answer, the millrace or feeder actually occupied by Enoch was to be occupied by the state feeder, “except at places where said millrace was too crooked to justify its occupation with
 
 *474
 
 the new work.” It was in contemplation of the parties that it was not the actual feeder and dam used by Enoch at the time that was to be reserved or excepted, bnt that new construction, affecting both dam and feeder, was to be so employed as to materially change the privilege that Enoch owned at the time of the grant. Furthermore, there could be no separate enjoyment of the water that passed through the newly constructed raceway or feeder by Enoch and the state. No definite or certain amount of water was reserved, which would be necessary if they should be construed to be an exception. The state’s use of the water was at all times paramount, and it had the option to utilize all of the waters of the feeder if necessary for canal purposes.
 

 Passing to the next question: If the “privilege” reserved by Enoch constituted a reservation then the only estate reserved to Enoch was purely personal to himself and existed only for the period of his own life. This rule is well established, as is shown by the following authorities: In
 
 Embleton
 
 v.
 
 McMechen,
 
 110 Ohio St., 18, 25, 143 N. E., 177, 179 (34 A. L. R., 689), the opinion, citing authorities in its support, expresses the recognized rule thus:
 

 “It has been held in the following cases that, if the grantor makes reservations in his deed of conveyance, words of inheritance must be used in order to pass a fee-simple estate.”
 

 This is also connoted in the opinion of Davis, J., in
 
 Gill
 
 v.
 
 Fletcher, supra.
 
 That words of inheritance are necessary if the terms of the deed are construed to be a reservation is shown by the. fol
 
 *475
 
 lowing authorities:
 
 Mandle
 
 v.
 
 Gharing,
 
 256 Pa., 121, 100 A., 535;
 
 Wadsworth, Admr.,
 
 v.
 
 Smith,
 
 11 Me., 278, 26 Am. Dec., 525;
 
 Engel
 
 v.
 
 Ayer,
 
 85 Me., 448, 27 A., 352.
 

 While the amended answer avers that the reservation to Enoch was “to himself, his heirs and assigns,” no such reservation appears in the deed; the very fact that Enoch reserved the privileges only for
 
 himself
 
 evidences the fact that the reservation was purely personal; otherwise he would have used terms of inheritance.
 

 However, there is still an additional reason why the demurrer to the respondent’s answer should be sustained. This reservation of water privileges, found in the deed of Enoch, was a reservation to himself “as to mill seats.” The pleadings of the respondent in this case are more notable in their silence as to essential facts than in what has been expressly alleged. Possibly a reply to the respondent’s answer would more clearly show the true situation. The amended answer does not disclose what “mill seats” existed at the time of the grant of reservation, or whether they still exist. Whatever construction should be given, whether reservation or exception, the term cannot be construed as giving authority to Enoch to employ the waters of the feeder for any other purpose than the mill seats mentioned in the deed. It fairly appears from the amended answer of the respondent that the present purpose for which the waters of the feeder are used is purely commercial and not connected in any wise with any mill seats upon Enoch’s property. Indeed it does not appear that the privileges are in any way appurtenant to
 
 *476
 
 the land which Enoch occupied when he made the grant to the state. If the waters are being used for commercial purposes, as alleged in the answer, the principle applied by Carroll, J., in
 
 Johnson
 
 v.
 
 Elkhorn Gas Coal Mining Co.,
 
 176 Ky., 676, 197 S. W., 409, applies here:
 

 “When there is a reservation of a lot for a specific purpose, and that purpose is expressed in the writing, it would be manifestly unfair to permit the grantor to use and occupy the lot for purposes entirely disconnected with and outside of the object of the reservation. The grantee might be perfectly willing to permit the grantor to reserve a lot for a specified purpose when he would not be willing that it should be reserved for another purpose, and, when the use to which the lot is to be put is plainly expressed in the contract, the grantor should not be permitted, over the objection of the grantee, to use the lot for an entirely different purpose and one that was not in the contemplation of the parties at the time the transaction was entered into.”
 

 In
 
 Dygert
 
 v.
 
 Matthews,
 
 11 Wend., (N. Y.), 35, there was a grant of land containing an exception in these words:
 

 “Excepting and reserving out of the said piece of land so much as is necessary for the use of a gristmill, on the east side of the road, at the west end of the sawmill dam.”
 

 The court held that this was a good exception, but that the grantee could maintain a trespass “against the grantor or his assigns, for an entry on the land for any purpose other than that specified in the reservation.”
 

 
 *477
 
 In
 
 Marshall
 
 v.
 
 Niles,
 
 8 Conn., 369, a grantor in his deed reserved a certain “building adjoining on the east end of said mill,” where a carding machine was in operation, together with the use of the water for certain purposes. It was held that such reservation included the building only, and that the right so reserved was “restricted to the buildings then existing, and did not extend to any other building subsequently erected on the same site.” To the same effect are the following ca.ses:
 
 Green Bay & Mississippi Canal Co.
 
 v.
 
 Hewitt,
 
 66 Wis., 461, 29 N. W., 237;
 
 Trustees of Phillips Exeter Academy
 
 v.
 
 New Parish in Exeter,
 
 68 N. H., 10, 36 A., 548;
 
 Washburn
 
 v.
 
 Copeland,
 
 116 Mass., 233. So that, whether the words employed in Enoch’s deed to the state are construed as a reservation or an exception, the water privileges retained by Enoch can be used only, as expressed in his deed, for mill seat purposes. Neither did the deed express, nor the parties thereto contemplate, that these water privileges were to be extended to other people, to other lands, or to other purposes, such as alleged in the amended answer, to wit, the purpose of conveying the same to Middletown, Ohio, for hydraulic purposes.
 

 Finally, the amended answer of the respondent alleges that, “in pursuance of said contract and said reservation, * * * the state of Ohio was, under said contract, obligated to furnish water to said Abner Enoch” and to maintain the feeder and headgates to their full capacity, so as to furnish the grantor a quantity of water not necessary for the canal company for the purpose of navigation. A sufficient answer to this claim of obligation
 
 *478
 
 upon the part of the state is furnished by the authorities heretofore cited, among which is
 
 State ex rel. Atty. Gen.
 
 v.
 
 Cincinnati Central Ry. Co.,
 
 37 Ohio St., 157, 174, 175, where Johnson, J., in the course of his opinion, relating to the powers of the board of public works in their care of the canals, and construing statutes in respect thereto, says, that all these statutes “show that the board, in the opinion of the Legislature, possessed no implied power to grant rights and privileges, or to create easements or burdens upon this public property in favor of individuals or corporations.” It follows, from what has been said, that there are various valid reasons why the demurrer to the respondent’s amended answer should be sustained.